# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955

---

| | |
|---|---|
| Appellate Court Caption | JOHN MAGGI, Individually and as Independent Administrator of the Estate of Gerald Maggi, Deceased, Plaintiff-Appellee and Cross-Appellant, v. RAS Development, Inc., Defendant-Appellant and Cross-Appellee (State Farm Fire and Casualty Company, Cross-Appellee). |
| District & No. | First District, Fourth Division<br>Docket No. 1–09–1955 |
| Filed | May 26, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Trial court's judgment for plaintiff in an action arising from a fatal fall at a construction site was affirmed, over defendant's contentions, *inter alia*, that plaintiff's addition of the proper defendant did not relate back to the filing of the original complaint for the purposes of the statute of limitations, that the verdict was against the manifest weight of the evidence where defendant did not retain control over the work, and that the trial court erred in allowing plaintiff to elicit testimony about the contract provisions discussing defendant's responsibility for safety and in refusing to bar evidence of the postremedial measures defendant was asked to take. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 02–L–010922; the Hon. Bill Taylor, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert K. Scott and Matthew R. Bloom, both of Scott, Halsted & Babetch, PC, of Chicago, for appellant RAS Development, Inc.

Michael Resis and Glen E. Amundsen, both of SmithAmundsen LLC, of Chicago, for appellant State Farm Fire & Casualty Company.

Michael W. Rathsack, of Chicago, for appellee.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Salone and Sterba concurred in the judgment and opinion.

## OPINION

¶ 1 Jerry Maggi, a 46-year-old veteran laborer on a bricklaying crew, died several days after an August 28, 2000 fall through an unprotected window opening at a new construction project on the near north side of Chicago, after a strap binding a bundle of bricks broke as he maneuvered it in a tight workspace under a patent scaffold on an exposed third floor, causing him to lose his balance. His estate brought a construction negligence lawsuit against several entities involved in the project, which consisted of the construction of several multistory condominium buildings on Wolfram Street. The case proceeded to a jury trial, with the jury returning a $3,286,382 verdict after finding decedent 1% contributorily negligent. The sole defendant at trial, RAS Development, appeals from the judgment entered on the verdict and the trial court's denial of its posttrial motion. Plaintiff also filed a cross-appeal, alleging that the trial court improperly declined to sanction defendant for understating the amount of available insurance coverage in discovery. For reasons that will be delineated at some length below, we affirm the judgment entered on the jury verdict and also affirm the trial court's refusal to sanction defendant.

¶ 2 BACKGROUND

¶ 3 The project on Wolfram Street was spearheaded by three men, Robert Levin, Arnold Boris and Saul Waimberk, whose first names' initials formed the RAS prefix. These three men were the sole shareholders in RAS Development, as well as RAS Wolfram, which then formed a partnership called Wolfram Towers. They hired RAS Development as the general contractor, meaning that they, as owners, essentially hired themselves to run the project. During the course of construction, various permits were issued by the City of Chicago which interchangeably referred to one or more of the entities as the owner or general contractor of the development.

¶ 4 Plaintiff's first complaint, filed on August 26, 2002, included as defendants various

entities that had some connection to the development, including, *inter alia*, plaintiff's employer, Rockford Construction, and RAS Wolfram, which initially volunteered in its answer that it was the general contractor. The parties engaged in lengthy written and oral discovery, some of which was designed to divine the interplay between the various RAS entities on the Wolfram Street project. In May 2003, before the limitations period had expired, RAS Wolfram, in an interrogatory answer, changed course and stated that it had hired RAS Development as the general contractor and that RAS Development had entered into separate contracts with subcontractors on its behalf, while also indicating that it could not locate the contract between RAS Wolfram and RAS Development. This turn was largely confirmed in a deposition of RAS Development's project manager, Lance Shalzi. During this period of time, plaintiff was seeking the contract that would unequivocally establish the proper entity to sue as the general contractor, with Wolfram Towers assuring plaintiff's counsel that "all" construction contracts had been produced. Neither RAS Wolfram nor Wolfram Towers moved for dismissal on the basis that it was not the general contractor.

¶ 5    Some 18 months passed without any further discovery on this subject. Then, after the four-year limitations period passed, plaintiff's attorney received a letter from defendant's in-house insurance counsel that indicated that it had located the contract that RAS Development entered into with Wolfram Towers, entitled "Standard Form of Agreement Between Owner and Contractor" (the Prime Contract), to perform general contracting services for the construction of the four-story residential buildings and that it would be changing its answer to confirm that RAS Development was the general contractor. This led plaintiff to voluntarily dismiss RAS Wolfram and amend his complaint, adding RAS Development as the general contractor. RAS Development then moved to dismiss the complaint against it, on the basis that it was outside the limitations period, while plaintiff endeavored to persuade the trial court that the amended complaint should relate back to the filing of the initial complaint because RAS Development knew all along that it should have been sued, while plaintiff was mistaken in his belief that RAS Wolfram was the general contractor. Initially, the trial court agreed with defendant and dismissed the complaint, but changed its mind and granted plaintiff's motion to reconsider.

¶ 6    The case then proceeded to trial, where plaintiff presented a case of the general contractor's failure to provide a safe place to work and for inadequately supervising the work of the subcontractors, while the defendant denied liability and claimed it would assert that the fall was not related to the breaking of the brick band but, rather, that Mr. Maggi suffered a coincidental heart attack, causing him to slip and fall from his elevated workspace. RAS Development planned to call John T. Barron, M.D., at trial to support this theory, but the trial court barred Dr. Barron from testifying that Maggi's fall was caused by a heart attack occurring immediately prior to his fall. The trial court initially ruled that Dr. Barron's opinion was not based on a reasonable degree of medical certainty but clarified upon defendant's motion to reconsider that it was not barring Dr. Barron's entire testimony, only the specific opinion about the timing of the attack. At trial, RAS Development did not mention this theory to the jury, did not make an offer of proof concerning Dr. Barron's testimony, and gave all appearances of having abandoned the theory until its resurrection at defendant's posttrial motion.

-3-

¶ 7                                    TESTIMONY AT TRIAL

¶ 8            There was but one eyewitness to Maggi's fall. The veteran bricklayer to whom he was assigned, Charles Winchester, testified on direct examination that the fall was precipitated by the breaking of a metal band that was meant to keep a large bundle of bricks in a stable condition which his laborer maneuvered into a convenient location for Winchester's use. Winchester explained that they were working on the front of the third floor of the condo building. A scaffold had been erected on that floor. The bundle of bricks that Maggi was bringing to Winchester weighed 150 pounds and needed to be maneuvered around the front of the scaffold, which had a set of cross-braces in the back. The front of the scaffold was unprotected by any bracing, but it was done so purposefully, to allow the mason access to the block, brick and mortar that he would need in order to build the brick wall. There existed a narrow space in between the scaffold and the outer wall. It was in this space that the mason plied his trade. While he was so engaged, there was no functional fall protection, but this was expected by the mason, because they were employing the so-called overhand bricklaying method, which involves the mason (or "brickie" in construction worker argot) kneeling or standing while leaning over the ledge and applying the bricks in "courses" to build the wall.

¶ 9            The fall itself, Winchester testified, happened as Maggi was attempting to "inch" the bricks under the scaffold close to Winchester's narrow workspace, which was hard by the edge of the building's under-construction wall. Winchester explained that Maggi had to "stationary" the bricks with his hands. It was at this point that the metal band popped and he went over the edge, through the bottom part of a work-in-progress window opening, right in the area where Winchester would have soon started to lay the next course of bricks. There was no safety rail in the area of that window opening or any other window opening on the jobsite. On the subject of the general contractor, Winchester testified that he did not have any contact with its representative and never attended any safety meetings with Lance Shalzi, the project manager for RAS Development, who was purportedly in charge of safety.

¶ 10           On cross-examination, defense counsel pressed a somewhat reluctant Winchester to testify that Maggi was standing in a prohibited area at the time of his fall. Winchester did admit that it would have been safer for Maggi to be under the scaffold, rather than between the scaffold and the edge of the floor. Winchester was also impeached with his deposition testimony that indicated that Maggi had "slipped and backed out the window" while trying to break a bundle of bricks down. Winchester admitted that Maggi was between the bricks (which were under the scaffold) and the floor edge when he "slipped out."

¶ 11           The jury also heard testimony from Patrick Brunory, the owner of Rockford Construction, the bricklaying contractor and the employer of Maggi and Winchester. He testified that the work area was first prepared by his brother, Sean Brunory, who would set up the scaffold, mortar table and other necessaries before the brickie and his laborer would begin their work. He explained that there was no fall protection because there was nothing for the protection to adhere to, since the building was still going up. He also explained that one could not guard or place any railings across an area that was involved in overhand bricklaying because it would interfere with the necessary access for the bricklayer.

-4-

¶ 12        Robert Levin, one of the owners of RAS Development, testified at some length about the project. He was asked to identify the Prime Contract and the contract with Rockford Construction. He explained that he had hired Rockford on other projects in the past. He agreed that it was the responsibility of RAS to employ a competent superintendent who would be responsible for jobsite safety. Lance Shalzi was employed for that purpose on this job. Shalzi was a licensed architect, but Levin was singularly unaware of whether he had any specialized safety background, OSHA training or the like. He said that Shalzi did have the authority to stop the work if he saw anything unsafe. He acknowledged that RAS was responsible for initiating, maintaining and supervising all safety programs on the jobsite and to designate a person to prevent accidents, while steadfastly maintaining that his company and its employees were "never, never" supposed to enter Rockford's work zone because it was "too dangerous."

¶ 13        The RAS project manager, Mr. Shalzi, testified that he was a licensed architect who worked as a project manager for the Wolfram project. He had been in a similar position for RAS on at least seven other sites. He admitted that he had never been trained in construction site safety. He had no training for fall hazards with buildings of height and this project was the highest building that he had worked on with RAS. He denied being the "responsible" person for safety for RAS Development. He said that the project did not have a superintendent and called himself a "manager." He never went to the area where Rockford was laying bricks because he would have been "removed" by Rockford. He did testify that there were metal safety rails across the window openings, but was not "100 %" sure that they were there before Maggi's accident. He said that he hired someone to put up boards on other floors after the accident and saw Rockford's men take them down when they did work on the individual floors.

¶ 14        Plaintiff's workplace safety expert, Philip Colleran, had more than three decades of construction safety experience, including 17 years as an OSHA compliance officer. He had published articles with respect to masonry, including the Mason Contractors Association of America's Safety Manual, and also wrote an article about overhand bricklaying. Colleran was critical of the actual presence of the scaffold near the building's edge because it was unnecessary and presented a physical impediment to the laborer getting the brick bundles to the brickie. He was of the opinion that the window opening through which Maggi fell should have been protected at all times just short of the actual overhand bricklaying by the mason, because the mason is trained specifically to deal with the danger and cannot carry out his job of coursing the bricks if there are bars or guardrails in his way. He explained that a guardrail should be placed until the bricklaying proceeds, when it would be replaced by blocks to form a temporary guardrail of sorts. The scaffold was set up prematurely, in his judgment, compromising the safety of the workspace. The configuration basically required Maggi to get into the brickie's area, because the back of the scaffold had cross braces and the only way for the laborer to get the bundle of bricks close to the bricklayer was to enter that treacherous area between the scaffold and the building's edge.

¶ 15        Colleran also found fault with the safety supervision on the site and opined that the failure of RAS Development to initiate a safety program with a competent superintendent was a proximate cause of Maggi's fall. Colleran acknowledged that the testimony established

that Maggi's position in between the scaffold and the floor edge constituted a fall hazard. He also affirmatively stated that Maggi should not have put himself in that position because of its danger, but allowed that he still could have fallen the same way were he physically located under the scaffold, as he was supposed to have been, since it was the edge of the scaffold that formed one border of the brickie area. In his opinion, whether Maggi was under or outside the confines of the scaffold and near the floor edge was of no moment, because the setup offered no protection for workers who might fall from either area. He opined that it was incumbent on RAS, through Shalzi, to intervene and require Rockford to correct the hazard presented by the presence of the scaffold near the edge and the absent fall protection. He also admitted that Rockford, plaintiff's decedent's employer, violated various safety rules and that it was primarily responsible for the safety of its own worksite.

¶ 16    Plaintiff's case-in-chief also included testimony from Robert Erickson, M.D., a neurosurgeon who was called in as a consultant to evaluate Maggi when he was brought to Illinois Masonic Hospital immediately after the fall. He explained that Maggi was resuscitated three times due to his heart stopping or due to a severe rhythm disturbance of the heart from the fall. He also testified that Maggi did have a myocardial infarction, as a result of the finding of an arrhythmia, but was of the opinion that he died as a result of the fall, due to brain and spine trauma, and severe chest trauma which caused a hemopneumothorax, which is the presence of blood and excessive air in the chest cavity causing compression of the lungs. He noted that the patient was unconscious and unresponsive in the "field" and remained so until he was pronounced dead on September 4, 2000.

¶ 17    In terms of damages, the jury also heard substantial testimony about the decedent, a lifelong bachelor who lived with siblings at the time of his death. Maggi was described as being very close to his family and was a "go-to guy" if anybody needed anything done. Defendant does not complain on appeal about the measure of damages awarded by the jury.

¶ 18    Defendant countered plaintiff's case solely with the testimony of Gregory Wisnewski, a licensed architect for some 32 years. He was of the opinion that the brick masons could not install fall protection such as guardrails while they were laying bricks for the wall. He felt that the area was safe because it was a controlled access zone that was restricted to bricklayers and laborers who were erecting the building from the inside. He, too, was critical of Maggi's positioning of himself between the scaffold and the building's edge because he put himself in a hazardous position in the mason's area. He opined that Rockford, not RAS, had overall safety responsibility and could have stopped the work if it saw a hazardous condition. He felt that the masonry work to erect the wall was consistent with the custom and practice of the industry.

¶ 19                                    ANALYSIS
¶ 20                            Relation-Back Doctrine
¶ 21    RAS Development's overarching contention on appeal is that the trial court erred in denying its motion to dismiss plaintiff's action pursuant to section 2–619(a)(5) of the Code of Civil Procedure (the Code) (735 ILCS 5/2–619(a)(5) (West 2006)) based on the applicable

statute of limitations. We review the trial court's denial of a section 2–619 motion to dismiss under the *de novo* standard of review. *Polites v. U.S. Bank National Ass'n*, 361 Ill. App. 3d 76, 80 (2005).

¶ 22    The four-year construction statute of limitations applied and it expired on August 28, 2004, prior to the date plaintiff added RAS Development as a defendant. See 735 ILCS 5/13–214 (West 2000). The issue thus is whether plaintiff's action against RAS Development should "relate back" to the original complaint, which was filed well within the statute of limitations, pursuant to section 2–616(d) of the Code (735 ILCS 5/2–616(d) (West 2002)). RAS Development contends that plaintiff knew of its involvement in the construction project more than 18 months before the limitations period expired but made no attempt to add it as a defendant until more than 2 years after the expiration of the statute of limitations. Contrarily, plaintiff contends that he satisfied the three prerequisites under the relation-back doctrine: (1) he filed suit on time; (2) RAS Development had notice of both the suit and that it was the intended target prior to the expiration of the limitations period; and (3) plaintiff's amended complaint grew out of the same transaction.

¶ 23    The first issue for us to resolve is whether section 2–616(d) applies to the present case, a question which turns on whether the facts suggest a case of misnomer or mistaken identity. *Pruitt v. Pervan*, 356 Ill. App. 3d 32, 36 (2005); *Fassero v. Turigliatto*, 349 Ill. App. 3d 368, 370 (2004). In a case of misnomer, the relation-back doctrine would automatically apply, and the amended complaint naming the proper defendant would be considered filed upon the filing date of the original complaint. *Fassero*, 349 Ill. App. 3d at 370. If this is a case of mistaken identity, we would need to analyze the three factors provided in section 2–616(d) to determine whether plaintiff's amended complaint relates back to the date of filing of his original complaint. *Id*. Thus, our initial inquiry is whether plaintiff would have named RAS Development as the defendant in his original complaint but for a mistake concerning the identity of the proper party. See *Polites*, 361 Ill. App. 3d at 82.

¶ 24    Whether a case involves mistaken identity or misnomer depends on the intent of the plaintiff as established by the plaintiff's objective manifestations of that intent as contained in the record. *Fassero*, 349 Ill. App. 3d at 371-72. "The most probative evidence of whom the plaintiff intended to sue is the party named in the complaint." *Id*. at 372 " 'If the named party in fact exists but is not a real party in interest, a court can conclude that the plaintiff has mistakenly sued the wrong party.' " *Id*. (quoting *Zito v. Gonzalez*, 291 Ill. App. 3d 389, 393 (1997)).

¶ 25    The *Fassero* court was the first appellate court to interpret the amended version of section 2–616(d). In *Fassero*, the plaintiff motorist brought a personal injury action, naming the owner of the car, instead of the driver, as the defendant. After discovering that she sued the wrong defendant, plaintiff brought a motion to amend the complaint after the statute of limitations had run. The trial court denied the motion, and the plaintiff appealed. This court reversed, holding that the case was of mistaken identity, not misnomer, explaining that the real party in interest was not originally sued or served, which indicated that the plaintiff was mistaken as to the correct party's identity. *Fassero*, 349 Ill. App. 3d at 373-74. The court noted that the plaintiff's complaint was directed at the driver of the vehicle, but the complaint named someone else as the defendant. *Id*. at 374. The court concluded that the plaintiff

simply sued the wrong person, meaning it was a case of mistaken identity and the misnomer rule did not apply. *Id.*

¶ 26    Following *Fassero*, the *Pruitt* court found that the relation-back doctrine did not apply in a premises liability action where the plaintiff's failure to name the proper defendants was due to a lack of information about the other parties' responsibility for the premises. There, the plaintiff assumed the management company was liable for her injury, rather than the property's owner. The plaintiff later attempted to amend her complaint to name the owners. This court found that the plaintiff was not misled in any way causing her to file her initial suit against only the management company. The *Pruitt* court concluded that it was not a case of mistaken identity because the plaintiff deliberately named the party she intended to hold responsible for her injuries. *Pruitt*, 356 Ill. App. 3d at 37.

¶ 27    Shortly after *Pruitt*, the *Polites* court considered section 2–616(d) where a bank customer sustained injuries while at a U.S. Bank branch office. Plaintiff's counsel sent a claim letter to the branch office where the injury occurred and received a response from an insurance claims service representing U.S. Bancorp, a separate entity described as U.S. Bank's parent corporation, indicating that the owner of the bank was U.S. Bancorp, not U.S. Bank. Unable to reach a settlement, the plaintiff filed a premises liability action against U.S. Bancorp. When U.S. Bancorp was subsequently dismissed from the case, the plaintiff amended his complaint to substitute U.S. Bank as the defendant after the statute of limitations had run. The trial court granted U.S. Bank's motion to dismiss, finding that the amended complaint did not relate back to the plaintiff's first complaint. This court reversed, holding that the plaintiff's amended complaint did indeed relate back to the first complaint, since plaintiff had originally intended to bring his claim against the owner and operator of the branch office and had acted reasonably in relying on the insurance claims service's statement that U.S. Bancorp was the proper defendant. *Polites*, 361 Ill. App. 3d at 84.

¶ 28    The current iteration of the relation back doctrine is patterned after Federal Rule of Civil Procedure 15(c). See *Polites*, 361 Ill. App. 3d at 88. Until very recently, there had been a split in the federal circuits on the very issue presented in the matter *sub judice*. This conflict in the federal case law has been unequivocally resolved by the United States Supreme Court's opinion in *Krupski v. Costa Crociere S.p.A.*, 560 U.S. ___, 130 S. Ct. 2485 (2010). There, a cruise ship passenger brought an action in the District Court for the Southern District of Florida against the carrier to recover for injuries she sustained while aboard the ship. On February 1, 2008–three weeks before the one-year limitations period expired–the passenger filed a negligence action against Costa Cruise. The complaint alleged that Costa Cruise "owned, operated, managed, supervised and controlled" the ship on which the passenger had injured herself. The passenger served Costa Cruise shortly thereafter.

¶ 29    Over the next several months–after the limitations period had expired–Costa Cruise thrice brought Costa Crociere's existence to the passenger's attention. First, in its answer to the complaint, Costa Cruise asserted that it was not the proper defendant, as it was merely the North American sales and marketing agent for Costa Crociere, which was the actual carrier and vessel operator. Second, in its corporate disclosure statement, Costa Cruise listed Costa Crociere as an interested party. Finally, Costa Cruise moved for summary judgment and again stated that Costa Crociere was the proper defendant. In June 2008, the passenger

responded to the motion for summary judgment and simultaneously moved to amend her complaint to add Costa Crociere as a defendant.

¶ 30 On July 2, 2008, the district court denied Costa Cruise's motion for summary judgment and granted the passenger leave to amend. Nine days later, the passenger filed an amended complaint and served Costa Crociere on August 21, 2008. On that same date, the district court issued an order dismissing Costa Cruise from the case pursuant to the parties' joint stipulation. Shortly thereafter, Costa Crociere moved to dismiss the complaint, contending that the amended complaint did not relate back under Rule 15(c) and was therefore untimely. The district court agreed and granted Costa Crociere's motion to dismiss, and the Eleventh Circuit Court of Appeals affirmed.

¶ 31 The Supreme Court reversed, holding that "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Krupski*, 560 U.S. at __, 130 S. Ct. at 2490. This precise juxtaposition is presented in this appeal, with defendant arguing that plaintiff should be subject to dismissal because he was not diligent in naming the right party and plaintiff arguing that defendant knew all along that it was the entity that acted as the general contractor, while he was clearly mistaken in his belief that a related corporate entity was the general contractor.

¶ 32 The Supreme Court directly addressed the meaning of the term "mistake" in the context of a party attempting to name an entity responsible for causing injury. It defined mistake as " '[a]n error, misconception, or misunderstanding; *an erroneous belief*.' " (Emphasis added) *Krupski*, 560 U.S. at ___, 130 S. Ct. at 2494 (quoting Black's Law Dictionary 1092 (9th ed. 2009)). "That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity." *Krupski*, 560 U.S. at ___, 130 S. Ct. at 2494. The Supreme Court reasoned, "[b]ecause the complaint made clear that [the passenger] meant to sue the company that 'owned, operated, managed, supervised and controlled' the ship on which she was injured, [citation], and also indicated (mistakenly) that Costa Cruise performed those roles, [citation], Costa Crociere should have known, within the Rule 4(m) period, that it was not named as a defendant in that complaint only because of [the passenger's] misunderstanding about which 'Costa' entity was in charge of the ship–clearly a 'mistake concerning the proper party's identity.' " *Krupski*, 560 U.S. at ___, 130 S. Ct. at 2497. The Supreme Court also noted that Costa Cruise and Costa Crociere are "related corporate entities with very similar names," which should have "heighten[ed] the expectation that Costa Crociere should suspect a mistake has been made when Costa Cruise is named in a complaint that actually describes Costa Crociere's activities." *Krupski*, 560 U.S. at ___, 130 S. Ct. at 2498. The Supreme Court lastly noted that "Costa Crociere's own actions contributed to passenger confusion over 'the proper party' for a lawsuit." *Krupski*, 560 U.S. at ___, 130 S. Ct. at 2498. Likewise, in the case *sub judice*, we are confronted with related corporate entities with similar names, one of whom surely contributed to confusion over the proper defendant's identity.

¶ 33 Therefore, we conclude that this is indubitably a case of the plaintiff being mistaken about the correct identity of the general contractor on the project in question. The language in plaintiff's original complaint supports the conclusion that plaintiff intended to sue the

entities that "owned and or were in charge of the erection, construction, repairs, alteration, removal and/or brick-laying" for the project site and also mistakenly alleged that Wolfram Towers performed those roles. RAS Development should have known that it was not named as a defendant in that complaint only because of plaintiff's misunderstanding about which of the related "RAS" corporate entities was the general contractor–clearly a mistake concerning the proper party's identity.

¶ 34 The mistake in identifying the general contractor in this case was not exclusive to the plaintiff, since an originally named, related defendant specifically admitted that *it* was the "general contractor" in response to the allegation about who "owned" or was "in charge of" the "erection" and "construction" of the Wolfram Street project. On November 26, 2002, Wolfram Towers, Marianne P., and RAS Wolfram jointly answered plaintiff's complaint, in which Wolfram Towers admitted that it was the general contractor for this project. Intending to sue the general contractor, and having been informed that Wolfram Towers was the general contractor, it is easy to see why plaintiff believed Wolfram Towers was the proper party. Our careful review of the record indicates that Wolfram Towers never filed a timely amended answer to inform plaintiff that both it and plaintiff were mistaken about the true identity of the general contractor. Just as the plaintiffs in both *Fassero* and *Polites* were led to believe they had sued the proper party, plaintiff in this case was led to believe through Wolfram Towers' own admission that he had sued the general contractor in charge of the construction site. For these reasons, we find this case is one of mistaken identity and section 2–616(d) applies.

¶ 35 Because we have determined this is a case of mistaken identity, we now return to a discrete analysis of section 2–616(d) of the Code to determine whether plaintiff's amended complaint against RAS Development relates back to the date of filing of his original complaint for purposes of the statute of limitations. Section 2–616(d), as amended in 2002, provides:

> "A cause of action against a person not originally named a defendant is not barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if all the following terms and conditions are met: (1) the time prescribed or limited had not expired when the original action was commenced; (2) the person, within the time that the action might have been brought or the right asserted against him or her plus the time for service permitted under Supreme Court Rule 103(b), received such notice of the commencement of the action that the person will not be prejudiced in maintaining a defense on the merits and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him or her; and (3) it appears from the original and amended pleadings that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery when the condition precedent has in fact been performed, and even though the person was not named originally as a defendant. For the purpose of

preserving the cause of action under those conditions, an amendment adding the person as a defendant relates back to the date of the filing of the original pleading so amended." 735 ILCS 5/2–616 (West 2002).

The first and third requirements of section 2–616(d) are easily resolved here. First, the statute of limitations had not expired when the original action commenced. The accident occurred on August 28, 2000. The original complaint was filed on August 26, 2002, more than two years prior to the expiration of the applicable construction statute of limitations. See 735 ILCS 5/13–214 (West 2000) (four-year time period for filing a construction personal injury action). Next, plaintiff has satisfied the third requirement because the amended pleading sets forth a cause of action that grew out of the same occurrence as that set forth in the original pleading. Plaintiff's amended complaints set forth the same set of facts as his original complaint. In fact, the amended complaint contains the precise language of the original complaint, except for the substitution of RAS Development as the only defendant.

¶ 36        Under the second requirement of section 2–616(d), the timely notice requirement, we must determine if RAS Development received notice of the commencement of the action within the applicable time period so that it was not prejudiced in maintaining a defense on the merits and knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against it. On appeal, RAS Development contends that plaintiff cannot satisfy this requirement, because he had specific knowledge of its existence and role as the general contractor at least 18 months prior to the expiration of the limitations period and did not add RAS Development until more than 2 years after the expiration of the limitations period.

¶ 37        Defendant's focus on what plaintiff actually knew or should have known is misplaced based on the specific language of this statute. In *Krupski*, the Supreme Court clarified that for purposes of relation back, the question is not whether a *plaintiff* knew or should have known of the identity of the proper defendant, but whether the *proper defendant* knew or should have known that it would have been named as a defendant but for an error. *Krupski*, 560 U.S. at __, 130 S. Ct. at 2493. This focus on the defendant's knowledge, rather than the plaintiff's knowledge, finds support in the purpose of the relation back-doctrine, which is:

> "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits. [Citation.] A prospective defendant who legitimately believed that the limitations period had passed without any attempt to sue him has a strong interest in repose. But repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity. Because a plaintiff's knowledge of the existence of a party does not foreclose the possibility that she has made a mistake of identity about which that party should have been aware, such knowledge does not support that party's interest in repose." *Krupski*, 560 U.S. at __, 130 S. Ct. at 2494.

¶ 38        In the case *sub judice*, as previously discussed, it is evident that the RAS entities knew that RAS Development was the proper party and thus was not prejudiced in having to

defend this suit on the merits. More to the point, defendant was possessed of the very same information that it somewhat confusingly communicated to the plaintiff, so it was more than aware that it was the true target of the litigation. In accord with the purpose of the statute–to resolve disputes on the merits–we cannot say that RAS Development was prejudiced in having to defend this suit when it was aware that plaintiff intended to sue the general contractor at least 15 months prior to the expiration of the limitations period. To find otherwise would be to grant RAS Development an inequitable procedural windfall by escaping liability only because plaintiff had misunderstood a crucial fact about its identity.

¶ 39    Lastly, while defendant urges this court to find that plaintiff did not act diligently once he received the information that RAS Development was the general contractor, the Supreme Court made it clear in *Krupski* that a plaintiff's diligence is not a factor enumerated in section 2–616(d) and the speed at which a plaintiff moves to amend a complaint has no bearing on the relation-back doctrine. See *Krupski*, 560 U.S. at __, 130 S. Ct. at 2496 ("The Rule plainly sets forth an exclusive list of requirements for relation back, and the amending party's diligence is not among them. *** [T]he speed with which a plaintiff moves to amend her complaint or files an amended complaint after obtaining leave to do so has no bearing on whether the amended complaint relates back.").

¶ 40    Accordingly, we conclude that RAS Development had knowledge of the commencement of the action well before the expiration of the limitations period. RAS Development clearly knew or should have known that, but for plaintiff's misidentification, it should have been sued. Pursuant to section 2–616(d), the trial court did not err in finding plaintiff's amended complaint related back to its timely filed original complaint.

¶ 41                            Control of the Project

¶ 42    RAS Development next contends that it was entitled to judgment *n.o.v.* because the jury's verdict was clearly against the manifest weight of the evidence where it did not retain control over the operative details of Rockford's work, nor did it supervise Maggi's work. RAS Development also contends that the verdict finding Maggi only 1% comparatively negligent was against the manifest weight of the evidence. Plaintiff asserts that RAS Development's motion was properly denied because defendant retained general control over site safety and the jury's verdict was not against the manifest weight of the evidence.

¶ 43    We apply the *de novo* standard in reviewing the circuit court's denial of a directed verdict and its denial of a motion for judgment *n.o.v. Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 167 (2003); *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 31 (2009). " '[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Buckholtz*, 337 Ill. App. 3d at 167 (quoting *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill. 2d 494, 510 (1967)). We hold that RAS Development's motion for judgment *n.o.v.* was properly denied because the evidence does not so overwhelmingly favor RAS Development that no contrary verdict based on that evidence could ever stand.

¶ 44    RAS Development correctly states that one who entrusts the work to an independent

contractor is generally not liable for that independent contractor's acts or omissions. *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 340 (2008). However, the retained control exception in section 414 of the Restatement (Second) of Torts states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

The comments following the section differentiate between vicarious liability and direct liability. Comment a to section 414 explains the requirements to find vicarious liability. That is, if the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein. Restatement (Second) of Torts § 414 cmt. a (1965). Comment b, in pertinent part, explains the theory of direct liability:

> "[T]he principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." Restatement (Second) of Torts § 414 cmt. b (1965).

Comment c further explains that, "There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965).

¶ 45    In this case, we believe the jury had sufficient evidence to find the defendant vicariously liable because it retained general control over the safety of the site or directly liable in that it failed to prevent a hazard that it was aware of.

¶ 46    First, in regard to RAS Development's vicarious liability, "The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 205 (2005). "When interpreting a contract, we must consider the entire document [citation] to give effect to the parties' intent [citation], as determined by the plain and ordinary meaning of the language of the contract [citation]." *Id.* Further, " ' "The power to forbid work from being done in a manner likely to be dangerous to himself or others is given as an illustration of the type of power retained by an employer which could subject him to liability." ' " *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1063-64 (2000) (quoting *Ryan v. Mobil Oil Corp.*, 157 Ill. App. 3d 1069, 1078 (1987), quoting *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 481, 488 (1973)).

¶ 47    In this case, a plain reading of the applicable contract provisions indicates that RAS Development was responsible for jobsite safety. AIA Document A201, entitled, "General

Conditions of the Contract for Construction" (the General Conditions), was expressly incorporated into the subcontract agreement between RAS Development and Rockford, entitled "Standard Form of Agreement Between Contractor and Subcontractor" (the Subcontract). Section 3.3.1 of the General Conditions provides in pertinent part:

> "The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract documents give other specific instructions concerning these matters."

Article 3.3.2 of the General Conditions states that RAS Development is responsible to the owner for acts and omissions of its employees, subcontractors and their agents and employees. Article 10.1.1 of the General Conditions states, "The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract." Article 10.2.1 of the General Conditions elaborates, "The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby." Article 10.2.3 of the General Conditions charges RAS Development with an affirmative duty to erect and maintain reasonable safeguards for safety and protection, and article 10.2.6 of the General Conditions requires it to designate a responsible member to prevent accidents.

¶ 48    According to these provisions, it is clear that the parties intended RAS Development to be responsible for supervising, directing, and controlling the construction project. This control included initiating, maintaining and supervising all safety precautions and programs to prevent damage or injury to employees. While Rockford may have been primarily responsible for safety, RAS Development retained a general right of control and was responsible to the owner for acts and omissions of its subcontractors.

¶ 49    That RAS Development was responsible for site safety and should have known that a fall hazard existed is further supported by the testimony adduced at trial. Robert Levin testified that the contract stated that the contractor would evaluate, and was fully and solely responsible for, jobsite safety. Levin further testified that RAS Development was required to employ a competent superintendent, Lance Shalzi, who was the day-to-day project manager, who had the authority and responsibility to stop activities if they were dangerous and had a duty to investigate if he saw a hazard. Levin agreed that RAS Development was responsible for initiating, maintaining, and supervising all safety precautions and programs, including erecting and maintaining reasonable safeguards to prevent accidents. Levin stated that RAS Development put up warning signs, employed a security guard for the site, put a fence around the project, and put up boards on the windows after the accident.

¶ 50    Furthermore, Lance Shalzi, the putative safety manager at the Wolfram Towers site, testified that he was not trained in construction site safety or for fall hazards. He conducted "walk-throughs" and had the ability to stop the work. Shalzi further substantiated Levin's testimony that RAS Development directed rails to be put around the building after the fall and that it posted signs for hard hats and no trespassing. Shalzi testified that he could order

subcontractors to correct any hazards he saw and that he was never refused entry to the floor; however, he did not make an effort to inspect the floor for safety. Also, Patrick Brunory, the owner of Rockford Construction, testified that Lance Shalzi had direct access to the floor and that he had safety discussions with Shalzi over basic safety procedures and fall prevention. He walked Shalzi through the site once a week, and while Rockford had its own safety meetings, his meetings with Shalzi each week sometimes discussed safety.

¶ 51 The bricklayer, Charles Winchester, testified that RAS Development did nothing to protect from falling and provided no verbal, written, or cautionary warnings. Dominick Novak, a laborer for Rockford, testified that while the floor was a restricted area, RAS Development and Shalzi were not restricted.

¶ 52 Philip Colleran, the workplace safety expert, testified that RAS Development was required to appoint a competent supervisor to inspect safety. Colleran testified that defendant had duties to initiate, maintain, and supervise all safety precautions and programs, to take reasonable safety precautions for the safety of employees, and to designate a responsible member to prevent accidents. It was necessary for the superintendent to be able to recognize hazards, and in this case, Shalzi did not have the proper safety training. Colleran further testified that RAS Development had constructive notice of the hazard because the scaffold posed an obvious fall hazard to a competent superintendent and Shalzi had the opportunity to see this hazard without even going up to the floor. While Rockford had the primary responsibility for safety, the general contractor must step in when the subcontractor fails to initiate safety. Under the prime contract, RAS Development was still responsible to the owners for acts and omissions of the subcontractor and had the authority to intervene. Colleran testified that, "It is not reasonable for a general to overlook obvious hazards that are universal to the construction industry."

¶ 53 We agree with plaintiff that it was unreasonable for RAS Development to overlook this obvious hazard. RAS Development was contractually obligated to oversee site safety and correct any known hazardous and dangerous conditions. The contracts demonstrate that defendant did have control over the project and was responsible for overseeing site safety. Levin, RAS Development's owner, even agreed that RAS Development was responsible for safety. While Rockford was required to take safety precautions on its own, it was also required to comply with any safety measures initiated by RAS Development. RAS Development posted warning signs, hired a security guard to watch the site, and put up boards in the windows. Further, defendant was contractually responsible for the acts and omissions of the subcontractors it hired. As a result, when Rockford failed to address the fall hazard, it was incumbent upon RAS Development to address the danger.

¶ 54 In addition, RAS Development was required to hire a competent superintendent, who was responsible for the prevention of accidents. See *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 36 (2009) (finding the general contractor's superintendent was not competent because he was unable to ask the right questions, lacked the necessary training, and failed to observe the hazard). Shalzi was not trained in construction site safety and personally stated that he was unable to recognize hazards. Colleran testified that Shalzi had the opportunity to view the hazard and that it was incumbent upon RAS Development to address safety concerns where Rockford failed to do so. Rockford had already performed the same work

on three buildings; therefore, defendant and its project manager, Shalzi, were put on constructive or actual notice of the hazardous means employed and the fall hazards that existed.

¶ 55　　　　In sum, RAS Development's responsibility for site safety is evidenced in the contracts and also through its actions as demonstrated by the testimony at trial. The jury was able to properly weigh the evidence and make an informed decision based on this evidence. Accordingly, RAS Development's motion for judgment *n.o.v.* was properly denied because the evidence does not so overwhelmingly favor RAS Development that no contrary verdict based on that evidence could ever stand.

¶ 56　　　　Similarly, the jury heard considerable but conflicting evidence about Maggi's contributory negligence. While there was testimony that he was in an area that was purportedly the exclusive domain of the bricklayer to whom he was partnered, plaintiff's expert Colleran testified that the fall was attributable, at least in part, to a failure to properly guard the window opening through which Maggi fell. In Colleran's opinion, the same fall could have occurred were Maggi under the scaffold and thus technically in his proper location, because the edge of the scaffold itself formed the boundary of the mason's area. Maggi's presence just under the scaffold or just outside its edge would have resulted in the same fall under these circumstances, according to Colleran, because there is no meaningful difference between those two locations as they relate to the window opening. According to plaintiff's theory of liability, the main vice of the scaffold setup was that it compelled the laborer to enter the brickie's area in order to deliver the bundles of bricks and other materials that he was required to supply to Mr. Winchester. Once delivered, these bundles of bricks needed to be "inched" into position and stabilized before removing the strapping, actions that foreseeably could place the laborer in an area of danger, especially with the unprotected nature of the nearly adjacent window opening. Given these facts, we will not second-guess the jury's assignment of 1% of contributory fault to the laborer who found himself in this perilous situation. Therefore, the jury's finding was appropriate and the evidence does not so overwhelmingly favor RAS Development that this verdict could never stand.

¶ 57　　　　　　　　　　　　　　　　Evidentiary Rulings

¶ 58　　　　RAS Development next contends that it is entitled to a new trial because three different evidentiary rulings made by the trial court, either individually or cumulatively, constituted reversible error, each of which will be addressed in turn below.

¶ 59　　　　First, RAS Development contends that the trial court erred when, following a motion *in limine*, it barred Dr. Barron from testifying that Maggi's fall was caused by a massive and fatal acute myocardial infarction occurring immediately prior to his fall. Initially, we note plaintiff's contention that we are precluded from reviewing this issue because RAS Development ultimately did not call Dr. Barron as a witness at trial and did not make an offer of proof with respect to Dr. Barron's opinions. Our supreme court explained in *Dillon v. Evanston Hospital,* 199 Ill. 2d 483, 495 (2002):

　　　　"When a trial court excludes evidence, no appealable issue remains unless a formal offer of proof is made. The failure to do so results in a waiver of the issue on appeal.

The purpose of an offer of proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced. However, an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced."

¶ 60 In this case, an offer of proof was not required because the trial court understood that Dr. Barron would testify that Maggi's death was due to a massive and fatal acute myocardial infarction prior to his fall rather than as a result of the fall. See *Dillon*, 199 Ill. 2d at 495 (offer of proof not necessary where trial court understood that doctor would testify as to the medical standard of care).

¶ 61 Turning to the merits, we review a trial court's decision on motions *in limine* and motions for a new trial for an abuse of discretion. *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 4 (2007); *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452 (2006). "A trial court abuses its discretion only if it 'act[s] arbitrarily without the employment of conscientious judgment, exceed[s] the bounds of reason and ignore[s] recognized principles of law [citation] or if no reasonable person would take the position adopted by the court.' [Citation.]" *Schmitz*, 368 Ill. App. 3d at 452. "In determining whether there has been an abuse of discretion, this court does not substitute its judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely." *Alm*, 373 Ill. App. 3d at 4.

¶ 62 RAS Development contends that Dr. Barron's opinions were based on a reasonable degree of medical certainty, evidenced by his report and deposition testimony and supported by a solid foundation of medical findings and anatomical facts. Plaintiff contends that the trial court's ruling was proper because Dr. Barron's hypothetical opinion about why Maggi fell lacked foundation where the unrebutted testimony established that he was acting purposefully right up to the moment he fell and that he was alive after he fell.

¶ 63 " 'The trial court is not required to blindly accept the expert's assertion that his testimony has an adequate foundation. Rather, the trial court must look behind the expert's conclusion and analyze the adequacy of the foundation.' " *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 401 (2007) (quoting *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146 (2000)). " 'If the basis of an expert's opinion includes so many varying or uncertain factors that he is required to guess or surmise to reach an opinion, the expert's opinion is too speculative to be reliable.' " *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 885 (1999) (quoting *First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 427-28 (1998)). Further, "expert opinions based upon the witness's guess, speculation, or conjecture as to what he believed might have happened are inadmissible." *Modelski*, 302 Ill. App. 3d at 886.

¶ 64 In ruling on plaintiff's motion *in limine*, the trial court explained that it was not barring Dr. Barron's entire testimony, only his specific opinion as to the precise timing of the attack:

"THE COURT: It's just his conclusions that he can look at a postmortem heart and determine that down to almost the precise second on when a person was having a cardiac arrest, which he alleged happened before the decedent fell, not

-17-

during the decedent falling, not after the decedent fell. So within three seconds, he can determine when a person was having a cardiac arrest. Unfortunately, for this Court, that doesn't pass my smell test. It doesn't smell right. It stinks. And therefore, his testimony will be barred. I'm sure the appellate Court will have more eloquent words to use in terms of supporting my decision.

MR. SCOTT [defense attorney]: Judge, it's not the entire testimony, unless I misheard you. It's his specific opinion.

THE COURT: Specific opinions, that's why I wasn't challenging his credentials or his qualifications. It's just his conclusion that he can tell to the second when a person is having a heart attack because if he can, I would ask him to please come to this Court today and watch me so that he could prevent my heart attack, since I have to go through this."

¶ 65   We conclude that the trial court did not abuse its discretion in barring Dr. Barron's testimony regarding the precise timing of the heart attack. While RAS Development chose not to call Dr. Barron at trial, presumably the trial court would have allowed him to testify as to his postmortem medical findings regarding Maggi's heart. The trial court explained that it did not find Dr. Barron unqualified and did not bar Dr. Barron's testimony entirely, only his specific opinion as to the precise timing of Maggi's heart attack prior to his fall. This finding does not exceed the bounds of reason considering Dr. Barron's opinion as to the precise timing of the heart attack was not supported by any other facts in evidence. There was no testimony presented that Maggi was disoriented or stuporous before he fell, the symptoms of cardiac arrest. Rather, eyewitness testimony revealed that Maggi fell when he pulled on the bundle's strap and it broke.

¶ 66   Moreover, Dr. Barron's conclusion that Maggi was dead when he hit the ground contradicts with Novak's testimony that he saw Maggi immediately after the fall and witnessed Maggi trying to get up. Finally, Dr. Barron stated in his deposition that he could not state to a reasonable degree of medical certainty what, if any, triggering event caused the heart attack to occur moments before Maggi fell. Dr. Barron also agreed that trauma from the fall could have been the triggering event. In light of these inconsistencies and uncertain factors, the trial court did not abuse its discretion in barring Dr. Barron from testifying that Maggi's fall was caused by a heart attack he suffered immediately prior to his fall.

¶ 67   Second, defendant contends that the trial court erred when it denied its motion *in limine* seeking to bar plaintiff from eliciting opinion testimony and legal conclusions relating to contract provisions discussing RAS Development's retained control and responsibility for safety. Defendant argues that plaintiff's adverse examination of Robert Levin and the direct examination of plaintiff's expert witness, Phillip Colleran, regarding the interpretation of contract provisions discussing RAS Development's responsibility for safety was improper. Plaintiff, meanwhile, disputes that either witness actually interpreted any provisions and further argues that RAS Development was not prejudiced by either examination. We review a trial court's decision on motions *in limine* and the admissibility of expert testimony under an abuse of discretion standard. See *Alm*, 373 Ill. App. 3d at 4; *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 866 (2004).

¶ 68 After carefully reviewing Robert Levin's examination, we find that the trial court did not abuse its discretion in permitting him to respond to questions regarding the text of the General Conditions. The complained-of line of questioning consisted of plaintiff's counsel reading the text of articles 3.3.1, 3.3.2, and 10.1 of the General Conditions to Robert Levin and asking him if the literal recitation of those provisions was correct. Robert Levin was not asked to "interpret" the contract and did not offer his opinion as to what the contract provisions meant. Instead, Robert Levin merely offered bland responses to these questions, like: "Whatever you said, that's what it says in the contract," and "That's what it says in the contract. I agree." During this line of questioning, the trial court also admonished plaintiff's counsel to read the language of the contract exactly. As such, this line of questioning did not call for legal conclusions or contract interpretation.

¶ 69 RAS Development also contends that Phillip Colleran, plaintiff's expert in construction safety, gave improper testimony regarding contract interpretation. During direct examination, Colleran was asked, "Did those safety responsibilities that we know about in the subcontract with Rockford relieve or exclude any responsibilities from the general contractor with respect to these type[s] of safety issues and accident prevention?" Over defense counsel's objection, Colleran responded:

> "The plaintiff's simple story is that the individual contractors have the primary responsibility to provide safety for their own individual workers.
>
> * * *
>
> What's at issue here is that we have a contractor that wasn't safe. And as such, the question is, to what extent some other entity that has the ability to intervene should intervene.
>
> And in this particular case, there was plain evidence before the accident, plain notice before the accident that there were hazards associated with falls and nothing was done about them.
>
> * * *
>
> So the point being is that the primary responsibility does rest with the individual employer, but it's in the face of that individual employer's failure to initiate safety that it's incumbent on the general to step in, to intervene and correct the matter, and they're entirely in a position to do that."

¶ 70 Colleran also testified during redirect examination that article 10 of the General Conditions would be pointless if all liability was placed on subcontractors instead of the general contractor.

¶ 71 Defendant does not contest that Colleran was qualified to give an opinion on workplace safety but rather contests that Colleran should not have been permitted to interpret the contract. Having worked as an OSHA safety officer for 17 years and having been in private practice since 1990, Colleran was well qualified in the field of construction safety and was permitted to draw on this extensive experience to formulate his opinion. In response to the complained-of question, Colleran did not reference the contract provisions. Instead, Colleran gave testimony that there was evidence of a noticeable fall hazard that existed prior to the accident and that nothing was done about those hazards. He testified that the primary

-19-

responsibility for those hazards rested with Rockford, but that in the event that Rockford had not taken corrective measures, defendant was obligated to intervene. This testimony does not amount to the interpretation of a statute or provide a legal conclusion. See *LID Associates v. Dolan*, 324 Ill. App. 3d 1047 (2001) (expert witness may not give testimony amounting to statutory interpretation or testify with respect to legal conclusions). Furthermore, even if Colleran was relying strictly on the contract to formulate his opinion, defendant questioned its own witness, Gregory Wisnewski, on the meaning of various contract provisions. Because its own witness testified as to his interpretation of these provisions, we cannot conclude that defendant was prejudiced in any meaningful way by Colleran's testimony. Accordingly, the trial court did not abuse its discretion in permitting Colleran's testimony in a manner which prejudiced defendant so as to warrant a new trial.

¶ 72        Finally, defendant contends that the trial court erred in denying its motion *in limine* seeking to bar plaintiff from presenting evidence that after the accident, the City of Chicago asked RAS Development to guard the opening where Maggi had fallen. Illinois law permits evidence of postremedial measures to show control, but not to prove negligence. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300-01 (1995). In ruling on the motion *in limine*, the trial court ordered, "The Plaintiff may introduce evidence relating to the Defendant's subsequent remedial measures for the purpose of demonstrating the Defendant's control." We find nothing improper in this ruling. The issue of control was a contested issue at trial where defendant ardently argued that it maintained no control over the third floor where Maggi was working. Plaintiff introduced evidence of the postremedial measure to demonstrate that defendant was in control of the third floor. Accordingly, the trial court did not abuse its discretion in permitting plaintiff to introduce evidence of this postremedial measure.

¶ 73                                  Cross-Appeal

¶ 74        The issue raised in plaintiff's cross-appeal is whether the trial court, after it had ruled on RAS Development's posttrial motion, retained subject matter jurisdiction pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002), to consider discovery sanctions related to RAS Development's alleged misrepresentation of its insurance coverage.

¶ 75        On June 5, 2009, the trial court entered judgment on the jury's verdict in favor of plaintiff in the amount of $3,286,382. Subsequent to the verdict, plaintiff learned that RAS Development had $3 million in liability coverage consisting of a $1 million contractor's policy and a $2 million umbrella policy with State Farm Fire & Casualty Company. On July 8, 2009, the trial court heard and denied RAS Development's posttrial motion. At that same hearing, plaintiff's counsel orally requested leave to issue deposition subpoenas for State Farm personnel and Robert Levin and represented that the depositions were necessary for two reasons: (1) to confirm the extent of the coverage; and (2) to pursue possible discovery sanctions for alleged misrepresentations concerning the extent of coverage. The trial court granted plaintiff "leave to issue subpoenas for depositions" for the president and chief executive officer of State Farm, a second State Farm employee, and Robert Levin. At no point did plaintiff file a motion for sanctions pursuant to Rule 219(c).

¶ 76        On July 22, 2009, the trial court denied RAS Development's emergency motion to

quash the subpoenas. On August 19, 2009, State Farm filed an emergency motion to reconsider the July 22 order denying the motion to quash the deposition subpoenas, which was also denied. At the hearing, the trial court stated that it had "ancillary" or "auxiliary" jurisdiction over the discovery sanctions. The trial court made clear the basis for its ruling: Illinois Supreme Court Rule 219(c). On September 8, 2009, State Farm filed an emergency motion to reconsider the August 19 order, asserting that the court lacked subject matter jurisdiction to entertain discovery sanctions under Rule 219(c). On September 9, 2009, the trial court granted the motion to reconsider and vacated the order of August 19, finding that it lacked jurisdiction "to rule upon any motion for discovery sanctions that might or could be filed in the future."

¶ 77 Plaintiff contends that the ruling on RAS Development's posttrial motion did not divest the trial court of jurisdiction over his discovery requests aimed at determining who misrepresented the available insurance coverage. RAS Development and State Farm contend that the trial court properly found that it did not have subject matter jurisdiction to proceed on plaintiff's request to pursue Rule 219(c) sanctions after judgment had been entered. The construction of a supreme court rule is a question of law, which we review *de novo*. *Badea v. Phillips*, 389 Ill. App. 3d 292, 296 (2009) (citing *In re Marriage of Zuberbier*, 309 Ill. App. 3d 386, 388 (1999)).

¶ 78 Rule 219(c) extends a circuit court's jurisdiction to address sanctions after a final judgment is entered; however, the motion for sanctions must have been " 'pending *** prior to the filing of a notice or motion seeking a judgment or order of dismissal.' " *Badea v. Phillips*, 389 Ill. App. 3d 292, 297 (2009) (finding no basis to conclude that the circuit court retained residual jurisdiction under Rule 219(c) where motion for sanctions was not filed until after the trial court had dismissed the underlying suit with prejudice) (quoting Ill. S. Ct. R. 219(c)). In this case, plaintiff never filed a motion for sanctions. Plaintiff merely requested leave to issue deposition subpoenas in an effort to determine if a later motion for sanctions would be appropriate. Rule 219(c) does not contemplate this scenario. Rather, by the express language of Rule 219(c), and consistent with this court's holding in *Badea*, the trial court would only retain residual jurisdiction if plaintiff had filed a motion for sanctions prior to the entry of judgment. Because plaintiff did not do so in this case, we conclude that the trial court properly found that it did not have residual jurisdiction to address this matter pursuant to Rule 219(c).

¶ 79                                      CONCLUSION

¶ 80 For the aforementioned reasons, we affirm the judgment entered on the jury verdict and also affirm the trial court's refusal to hear the motion for sanctions.

¶ 81 Affirmed.