# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Martinelli v. City of Chicago*, 2013 IL App (1st) 113040

---

| | |
|---|---|
| Appellate Court Caption | DONALD MARTINELLI and ANNETTE MARTINELLI, Plaintiffs-Appellees, v. THE CITY OF CHICAGO. Defendant-Appellant (SBC, n/k/a AT&T, Intervenor). |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-3040 |
| Filed | April 25, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A verdict for plaintiffs was affirmed in an action arising from one plaintiff's loss of a leg when he was struck by a motorist at a jobsite where employees of defendant city were working on underground water lines and plaintiff was engaged in protecting adjacent telecommunication cables from harm, since the evidence showed that just before the accident, the city crew removed the barricades and flagman present for safety purposes at the site when the crew went on an extended lunch break and that negligence was the proximate cause of plaintiff's injury |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-11846; the Hon. Irwin J. Solganick, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, Sara K. Hornstra, and Stephen G. Collins, Assistant Corporation Counsel, of counsel), for appellant.

Michael W. Rathsack, of Law Office of Michael W. Rathsack, and Mark E. McNabola, of McNabola Law Group, both of Chicago, for appellees.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.

Justices Epstein and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1    On a daily basis in the City of Chicago (City), there are numerous roadway construction projects that have an impact upon the safe flow of automobiles and pedestrians, as citizens, workers and visitors travel across its many streets. Maintenance of the City's vast and aging infrastructure is a never-ending process, with public and private employees often working together to erect, maintain or repair streets, bridges, viaducts and the like, along with sewer and water systems. This case reveals unfortunate consequences of poor planning and execution of such projects.

¶ 2    On February 2, 2002, plaintiff Donald Martinelli (Martinelli) and his coworker, Raymond Santiago, worked for a telecommunications company and were assisting City workers who were involved in a somewhat mundane water department job on Milwaukee Avenue, near its intersection with Leavitt Street. During the morning construction work, the City had established certain safety provisions including barricades (in the form of large vehicles) and flagmen, but those protections were removed when City workers went on an extended lunch break, leaving the telecommunications workers in the largely unprotected workzone. During this time an admittedly distracted motorist, Oscar Soto, lost control of his vehicle, glanced off Santiago's truck and pinned Martinelli to the bumper of his truck, traumatically amputating his left leg above the knee. Martinelli and his wife sued the City for negligence in the manner and method that it conducted its construction work and the attendant safety considerations.[1] At trial, the jury was instructed to consider whether the City was negligent for (1) blocking the southeast bound lanes of traffic, forcing traffic to drive into the undivided northwest lane; (2) failing to erect a temporary traffic control zone with advanced warning in order to create an unambiguous path around the work zone; (3) failing to use

---

[1] Soto as well as Manual Gonzalez, who owned the vehicle driven by Soto during the incident, were originally defendants in this action but were subsequently dismissed as defendants following a settlement with plaintiffs. In addition, Martinelli's employer, SBC, n/k/a AT&T, was granted leave to intervene in this action but is not a party to this appeal.

flagmen and barricades; and (4) failing to create a buffer zone between workers and motorists. The jury returned a verdict of $6,952,000 for Martinelli's injuries and his wife's loss of consortium. The jury also answered in the negative a special interrogatory that sought to blame the distracted driver as being the "sole proximate cause" of Martinelli's injury. The City appeals, claiming, *inter alia*, that the trial court should have entered a judgment notwithstanding the verdict (judgment *n.o.v.*) because the distracted driver was the sole proximate cause of the accident and because the City should have been found to be immune for any failure to provide traffic control devices or warning signs. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Over the course of this week-long jury trial, the parties presented numerous witnesses. Plaintiffs testified on their own behalf as well as presenting the testimony of Santiago and Soto. Plaintiffs also presented medical testimony, expert testimony from a civil engineer, and the testimony of several employees of the City's water department, including Michael Dwyer, Neil Kelly and Donald Stewart. In addition, the City presented the testimony of an investigator from the Chicago police department, an expert in traffic crash reconstruction, and Sonia Kalfas, who witnessed the incident.

¶ 5        Milwaukee Avenue is a diagonal, arterial thoroughfare that runs in a northwest/southeast direction in the City. It intersects Leavitt Street in the City's Bucktown neighborhood, only a short distance from a viaduct at Bloomingdale Avenue. On February 2, 2002, the City was engaged in water department road work in this general area. Specifically, the City was attempting to perform a "cut and seal" job, a relatively common procedure in which a hole would be dug through the pavement, allowing access to water lines beneath the street, one of which was to be cut and sealed. Thereafter, the pavement would be repaired and the road restored to its previous condition. In virtually every such job, the City coordinates with the appropriate telecommunications or power company to make sure that the City's activities do not impair any lines or equipment maintained by those entities. Martinelli and Santiago worked for SBC and were engaged in marking locations for cables that were beneath the area where the work was to be undertaken. The City's seven-person crew from the water department consisted of a foreman, three laborers, a dump truck driver and a hoisting engineer. It was later augmented by another engineer who operated a ram hoe which was capable of cutting through the cobblestone which lay under the asphalt surface of the roadway.

¶ 6        There was conflicting testimony at trial regarding when Dwyer, the City foreman, arrived on the jobsite. According to Santiago, in the late morning, he and Martinelli were already in the process of identifying the location of cables (which would alert the City digger) when Dwyer arrived. Santiago said Dwyer gave him and Martinelli the specific area in which the City intended to do its work, which led them to finish their work. This work involved more than just painting on the asphalt road surface, however, as Martinelli had to go underground via a manhole to identify the specific location of the cables and send a radio signal to Santiago, who would mark the proverbial spot. Their SBC vehicles were nearby, with strobe

lights operating. Martinelli and Santiago also put some orange traffic cones in the area where they were working and erected a temporary cage around the manhole in which Martinelli was working.

¶ 7    Dwyer's testimony regarding his arrival time at the Milwaukee jobsite was less than consistent. He testified that his worksheets indicated he and his crew were engaged in a job in the DePaul neighborhood, on Kenmore near Belden Avenue earlier that morning. His worksheets also indicated that his men took a lunch break at a fast food location at Wellington and Sheffield, but only after they had arrived at the Milwaukee jobsite. This restaurant, however, was located north of the Milwaukee job AND north of the Kenmore job. The crew's circumnavigation would have thus involved finishing up at Kenmore, driving south to the Milwaukee job, working briefly, and then driving back, past the Kenmore job, to arrive at the restaurant at Wellington and Sheffield. As for his own arrival at the Milwaukee site, Dwyer repeatedly testified that he did not remember being at the Milwaukee jobsite until after the accident had occurred, despite his worksheets' indication that he was there from 11:29 a.m. to 12:05 p.m. and despite the fact that Santiago testified that Dwyer was at the scene giving him information about the location of the water department's work well before the accident occurred. At one point, Dwyer even testified that he was unaware that the SBC employees were at the jobsite until he and his crew "pulled up and saw the fire truck and ambulance." In response to questions about the inconsistent entries in his records, Dwyer admitted that these were sometimes "fudged." Furthermore, despite several instances where Dwyer claimed a lack of recollection of events prior to the involved accident, as described *infra*, he acknowledged that his crew was involved in barricading and flagging the work area *before* lunch.

¶ 8    The City had acquired a permit to perform this work that required the City to use barricades and flagmen as needed. Dwyer testified that he would not have exposed his workers to any potential injury and that he made sure that the work site was safe in various ways, including the placement of large City vehicles as barriers to entering the viaduct in the southeast bound lane. He also testified that his laborers would have been on both sides of the viaduct to slow traffic as it approached the viaduct from both sides. In addition, Dwyer testified that as the City's foreman, he was supposed to ensure that pedestrian and vehicular traffic continued at all times on the date in question, without road closures. He further testified that his laborers, clad in fluorescent vests, were directing traffic before lunch by placing big trucks in a way to alert drivers that they could not drive in that direction and directing drivers around the work area. He admitted that he was supposed to keep the area safe for all workers, pedestrians and motorists, while repeatedly suggesting that he interpreted the permit to mean that his responsibility only related to when he and his crew were actively working at the site.

¶ 9    As the morning's activities progressed, the City's workers began their attempts to break the pavement. This involved the use of a dump truck, a backhoe and a compressor to power the jackhammer. The arrival of the backhoe nearly coincided with the conclusion of the work of Martinelli and Santiago. The extent to which the southeast bound lane of Milwaukee was closed to traffic was a subject which received some contested testimony at trial, with the City endeavoring to prove that traffic could still go through a small part of that lane and the

plaintiffs attempting to show that most southeast bound vehicles were going around the Bloomingdale viaduct's center pillar into the northwest bound lane in order to continue traveling toward downtown, only to return to the southeast bound lane once they passed the viaduct. Santiago and Soto's testimony established that a number of vehicles were traveling in this fashion, including at least one CTA bus.

¶ 10    According to Santiago, after a very short amount of work that accomplished the removal of the top two inches of pavement, leaving a hole in the street (the cobblestone required more heavy equipment), Dwyer and his crew left, only to return after the accident had already occurred. Suffice it to say that the documentary evidence related to the time spent by the crew at lunch was inconsistent and at times falsified. This much was essentially conceded by Dwyer. In any event, when the City workers left, they took their trucks and most of their personal vehicles, along with any employees that were helping move traffic through or around the viaduct. Dwyer admitted that on other such occasions, he had left flagmen in place. Santiago's testimony also revealed that a different City vehicle, a ram hoe which was capable of digging through the cobblestone underlayment (which the jackhammer could not do), arrived while the other City workers were at lunch. This worker proceeded to dig a hole through the cobblestone shortly before the accident. That vehicle and the resulting hole were depicted in at least one photograph that was taken with the Soto vehicle still at the scene, which was admitted into evidence and published to the jury. The operator of the ram hoe, on the other hand, testified via evidence deposition that he had not arrived until after the accident.

¶ 11    The accident itself was described by various witnesses at trial, although Martinelli testified that he did not see Soto prior to the accident. Essentially, the evidence established that Soto was operating his vehicle in a southeast direction on Milwaukee Avenue. Soto testified that as he approached the viaduct in question, he saw some "stuff" ahead in his lane and did not think that he could pass under the viaduct in that lane. Ahead of him, he saw a car and followed it as it went around the viaduct pillar and entered the northwest bound lane. As he approached Leavitt Avenue after passing under the viaduct, he was alarmed to see vehicles approaching him from the opposite direction, causing him to quickly veer back into the southeast-bound lane. At the same time, a pack of cigarettes slipped from his lap to the floor of the car. Soto's response was to reach for the pack, which only exacerbated his turn to the right and he wound up pinning Martinelli against the bumper of his truck. Soto testified that he got out of his car and asked for help from a southeast-bound CTA bus driver who had just come through the viaduct in the same manner as he had. Santiago corroborated Soto's version of the path of his vehicle as it approached Martinelli.

¶ 12    Both parties proffered expert witnesses who gave conflicting testimony on the appropriateness of the work site from a traffic management and worker safety standpoint. Plaintiffs' expert, Richard Cannon, relied upon the permit, various jobsite documents and regulations from the City's department of transportation, along with the Manual on Uniform Traffic Control Devices (MUTCD), which applies to municipalities like the City. He was sharply critical of the absence of an overall plan for effectively diverting vehicular traffic and protecting workers within the work zone. He presented a plan to the jury of what could have been done to establish a safe work zone, by the use of barricades and other safety devices.

Cannon admitted that a properly placed vehicle could represent a safety device under these sorts of circumstances, but insisted that it would need to be augmented with other devices. In his opinion, had the proper safety zone been established, this accident would not have occurred.

¶ 13     The City's expert, Gary Cooper, did not address establishment of any safety zone in the area of the work but, rather, focused on the conduct of Soto, the distracted driver, testifying that it would take slightly less than 3.5 seconds for Soto's vehicle to travel the 150 feet from the viaduct to the spot where the collision took place. Soto's reaction time to any stimulus, in his opinion, would have consumed nearly half of that time.

¶ 14     In witness examination and in argument, both parties vigorously pursued their differing theories of the real cause of this accident. Martinelli's lawyers pursued a theory that acknowledged Soto's negligence, while faulting the City for its role in establishing the unsafe environment where the accident took place. The ultimate arbiter of these factual issues, the jury empaneled to hear the dispute, sided with plaintiffs and specifically rejected the City's sole proximate cause defense with its negative answer to the City's special interrogatory.

¶ 15                                         ANALYSIS

¶ 16     The City's arguments on appeal mirror arguments that it made during the discovery and trial proceedings of the underlying lawsuit. In various pretrial hearings, the City argued that it was immune from any failure to provide traffic control devices or warning signs, pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (the Act) (745 ILCS 10/3-104 (West 2010)). It also unsuccessfully attempted to have the case dismissed before trial on the sole proximate cause issue and renewed this argument in the form of a judgment *n.o.v.* motion, which was denied at trial. In addition, the City averred that it was entitled to a judgment *n.o.v.* because it "owed no duty" to protect Martinelli from the "unforeseeable" negligence of Soto. Finally, on appeal, the City urges us to grant a new trial due to adverse and allegedly erroneous evidentiary rulings by the trial court. We will examine each of these arguments in turn.

¶ 17                                      A. IMMUNITY

¶ 18     The City's argument with respect to its immunity for failing to provide traffic control devices presents a question of law, which we will review *de novo*. *Hess v. Flores*, 408 Ill. App. 3d 631, 636 (2011). In addition, a unit of local government, such as the City, is liable in tort to the same extent as a private party unless the Act applies. *Prough v. Madison County, Illinois*, 2013 IL App (5th) 110146, ¶ 22. Section 3-104 of the Act provides as follows:

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to *initially* provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." (Emphasis added.) 745 ILCS 10/3-104 (West 2010).

The City's argument here gains little legal purchase, however, because section 3-104, the section which it cites, refers to the absence of any duty to "initially" provide these sort of devices. 745 ILCS 10/3-104 (West 2010). In this trial, evidence was presented indicating that the City actually provided various forms of devices in an effort to provide a safe work site and a safe area for motorist travel. The City was sued here because it removed some of those protections while its workers went on an extended lunch break, even though others continued to work at the site. Accordingly, section 3-104 does not apply to those bases of negligence.

¶ 19     The City suggests that section 3-104 provides a municipality with absolute immunity with respect to the removal of traffic devices, relying on *Robinson v. Atchinson, Topeka & Santa Fe Ry. Co.*, 257 Ill. App. 3d 772 (1994). We disagree. In *Robinson*, the plaintiffs asserted that Allen Township had a duty to maintain a sign, providing advance warning of a railroad crossing, that had been erected 10 years prior but had been absent for the 3 years leading up to the incident. *Id*. at 773-74. The plaintiffs argued that even if section 3-104 immunized the township from any duty to initially erect the sign, the township nonetheless had a duty to maintain the sign once erected. *Id*. at 775-76. The appellate court found, however, that the case before it did not present a question of maintenance but, rather, the plaintiffs were essentially arguing that the township was forever required to keep a warning sign on 15th Road. *Id*. at 776.

¶ 20     At most, *Robinson* establishes that a municipality has no duty to provide a particular traffic device indefinitely. Here, however, no such duty has been suggested. The City's actions in disrupting traffic, implementing traffic devices and removing those devices during ongoing road work all occurred within a limited period of time and created the peril that immediately led to Martinelli's loss of limb. Accordingly, *Robinson* is entirely distinguishable.

¶ 21     Additionally, plaintiffs supplied another potential basis for the City's liability that was not based on the City's failure to act to protect others, as contemplated by section 3-104, but rather was based on the City affirmatively causing an injury through its actions. Specifically, plaintiffs alleged that the City blocked the southeast-bound lane, forcing the traffic in that lane to drive into the northwest lanes. As a result, section 3-104 does not encompass this basis for the City's liability. Although the City submitted a special interrogatory on sole proximate cause, it did not similarly test the jury's verdict relative to the discrete issue of duty. Because the jury returned a general verdict, the City must demonstrate that no basis for negligence presented to the jury was sound in order to obtain relief. See *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101 (2010) (a general verdict will be upheld if there is sufficient evidence to sustain either legal theory and the moving party failed to request special interrogatories). Under these circumstances, even were we to assume that this allegation of negligence based on the failure to provide traffic control devices was improvidently submitted to the jury, the verdict must be affirmed because the verdict can be supported by the remaining allegation of negligence and the Act does not immunize the City from liability here. See *Robinson v. Washington Township*, 2012 IL App (3d) 110177, ¶ 12.

¶ 22                              B. PROXIMATE CAUSE

¶ 23     The City next contends that the trial court erroneously denied the City's motion for a judgment *n.o.v.* because the City's conduct was not a proximate cause of plaintiffs' injuries, an issue that we review *de novo. Mull v. Kane County Forest Preserve District*, 337 Ill. App. 3d 589, 591 (2003). In order for the City to prevail here, we would have to conclude that when the evidence is considered in a manner most favorable to the nonmovants, plaintiffs, the evidence nonetheless so overwhelmingly favors the City that any verdict against the City could never stand. See *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. To prove negligence, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) the breach was the proximate cause of the plaintiff's injuries. *Perfetti v. Marion County, Illinois*, 2013 IL App (5th) 110489, ¶ 16. In addition, proximate cause requires a plaintiff has to establish both "cause in fact" and "legal cause." *Rivera v. Garcia*, 401 Ill. App. 3d 602, 610 (2010). Cause in fact is established if the occurrence would not have happened "but for" the conduct of the defendant. *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 1007 (2005). Furthermore, legal cause is a question of foreseeability and whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct. *Simmons v. Homatas*, 386 Ill. App. 3d 998, 1010 (2008).

¶ 24     The City's overarching argument below and in this court relates to its contention that it cannot be held liable for Martinelli's injuries because the conduct of Soto should be deemed to be the sole proximate cause of this occurrence. See *Stackhouse v. Royce Realty & Management Corp.*, 2012 IL App (2d) 110602, ¶ 37. In a related way, the City also argues that Soto's conduct could be described as constituting an intervening cause of Martinelli's injuries, thereby removing it from any legal liability. See *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 406-07 (2004). In yet another related way, the City urges that it could not owe any legal duty because Soto's conduct was simply unforeseeable. At this point, it also bears repeating that the jury answered the City's sole proximate cause special interrogatory in the negative, meaning that it found that the City's conduct was also a proximate cause of Martinelli's injuries. Under these circumstances, it would be remarkably unusual for a trial court or an appellate court to enter a judgment for defendant, the City. See *Brobbey v. Enterprise Leasing Co. of Chicago*, 404 Ill. App. 3d 420, 433 (2010) (the question of proximate cause is one for the jury). Based upon the following analysis, we respectfully decline the City's invitation to usurp the role of the jury.

¶ 25     Plaintiffs argue that the evidence in this case more than adequately established both cause in fact and legal cause. We agree. The evidence at trial clearly supports the jury's finding that but for the City's conduct, this accident would not have happened. First, the jury heard that the City's permit required it to provide various measures to ensure safety. The jury also heard evidence that the City placed certain vehicles in locations to provide a measure of safety, that its laborers served as flagmen to alert motorists of the presence of workers in the roadway and that the roadway was partially closed. Testimony at trial also revealed that Dwyer decided to break with his crew for lunch, taking their equipment with them, along with the workers who were alerting motorists of the work activity. The jury was entitled to find that this behavior amounted to an effective abandonment of Martinelli and Santiago which allowed this accident to occur. In addition, Soto himself testified that he was confused by what was occurring near the scene of the occurrence. He saw that he could not go through

the viaduct and assumed that it was okay to just follow the vehicle in front of him, which was going around the viaduct's pillar into the northwest bound lane. He testified that he was surprised by the presence of oncoming traffic, which caused him to veer back to the right, toward his lane. This put him on a path toward Martinelli, who was unaware that a vehicle was headed his way. Soto testified that he would have slowed down if there had been a barricade in the area.

¶ 26    Finally, plaintiff's safety expert testified that this accident would most likely not have occurred had the City properly followed the requirements of the Manual on Uniform Traffic Control Devices and of the Chicago department of transportation regarding the establishment of an effective traffic zone. This clearly supports the finding that plaintiffs supplied adequate proof of cause in fact.

¶ 27    Despite this, the City contends that plaintiffs did not and cannot prove legal cause. The City vehemently argues that Soto's continuing conduct in "intentionally" taking his eyes off the roadway and purposefully reaching for the slipped pack of cigarettes renders his conduct utterly unforeseeable and removes the City from any liability. Furthermore, the City urges that its arguably negligent conduct did nothing more than supply a condition that made the accident possible, citing a line of cases decided by this court and our supreme court. See *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004); *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252 (1999); *Kirschbaum v. Village of Homer Glen*, 365 Ill. App. 3d 486 (2006); *In re Estate of Elfayer*, 325 Ill. App. 3d 1076 (2001); *Quintana v. City of Chicago*, 230 Ill. App. 3d 1032 (1992); *Newsome v. Thompson*, 202 Ill. App. 3d 1074 (1990).

¶ 28    These arguments are unavailing, given the rather simple inattention of Mr. Soto. As stated, Soto veered back into his lane in the face of unexpected oncoming traffic. According to him, this coincided with his cigarettes slipping from his lap to the floor and he instinctively looked down and reached for the cigarettes, which caused him to unintentionally turn more to the right and hit Martinelli. In making its argument in this regard, the City essentially tries to argue that Soto was unforeseeably negligent in his operation of his motor vehicle. As one might expect, the City made similar arguments to the jury. In its brief before this court, the City faults Soto because he got scared, causing him to turn fast and while swerving, he "took his eyes completely off the road to pick [the cigarettes] up." The City chides Soto for striking Martinelli despite the presence of traffic cones and flashing lights atop the SBC vehicles, arguing that the collision took place "solely because of that *reckless* act" (emphasis added), exhibiting a "staggering lack of care." The City claims that this collision had nothing to do with "the City's obstruction of the road" and that the eventual outcome was "extremely remote."

¶ 29    While these arguments correctly reference testimony at trial, they tend to ignore the eminently foreseeable inattentive conduct of motorists and the fact that the City itself removed several layers of safety which this jury found would have prevented this accident. The arguments also ignore the testimony of Dwyer, who freely admitted that it was his duty on the date in question to provide safety for all workers, pedestrians and motorists. This was to be done by way of barricades and flaggers. Competent evidence at trial established that this protection was supplied before and after the City's workers ate lunch, but not during that extended period of time, despite the fact that Martinelli, Santiago and at least one City

worker were then engaged in work in that area.

¶ 30    As for the conduct of automobile drivers, despite the City's suggestion to the contrary, it is well known that people do various things that lead to distracted driving. This conduct can include: spilling a drink; dropping a cigarette; reaching for an item of food or drink; applying makeup; looking at a map; looking for loose change on the seat; or looking away from the roadway for any number of other reasons. Stating the obvious, this era's drivers are distracted on a regular basis by their apparent need to remain in constant communication on their cell phones or other hand-held devices. This sort of run-of-the-mill distracted driving clearly can supply a basis for calling a driver negligent or careless, and no rational thinker could think such conduct would be legally unforeseeable. See *Gilmore v. Stanmar Inc.*, 261 Ill. App. 3d 651, 658 (1994).

¶ 31    We further note that following oral arguments held in this case, we granted the City's motion to cite supplemental authority, including *Bentley v. Saunemin Township*, 83 Ill. 2d 10 (1980). As stated therein, "[t]he standard of reasonable conduct may require the defendant to protect the plaintiff against that occasional negligence which is one of the ordinary incidents of human life, and therefore to be anticipated." (Internal quotation marks omitted.) *Id*. at 16. The distraction experienced by Soto in this case is one such ordinary incident to be anticipated. In addition, applying the *Pedrick* standard, the court in *Bentley* found that the evidence, when viewed in the light most favorable to defendants, the nonmovants, indicated that they should have foreseen the driver's failure to stop absent a visible stop sign. *Id*. at 15. In that case, evidence showed that the stop sign at issue had been obscured by hanging branches. *Id*. at 12. As in *Bentley*, applying the *Pedrick* standard, the City should have foreseen that, having blocked a traffic lane and implemented safety measures, the removal of those safety measures would negate the ability of the common distracted driver to react to danger created by the City's conduct. Accordingly, we find *Bentley* supports our determination.

¶ 32    Soto's conduct was admittedly careless. Plaintiffs conceded this fact and the jury clearly did not accept the City's argument that Soto's conduct was the *sole* cause where there was so much evidence that the City was negligent in planning the construction work, not to mention that it solely decided to remove much of the safety that it had previously supplied, only to allow its crew to take a lunch that was unauthorized in its length and was lied about in City work logs.

¶ 33    As mentioned above, the City claims that its conduct could only amount to a condition that made the injury possible and not a legal cause. Relying on *Galman*, the City claims that the accident in which Martinelli was injured was not the type that a reasonable person would foresee as a likely result of his conduct. *Galman*, 188 Ill. 2d at 261. Thus, *Galman* suggests that legal cause cannot be proven if the actor's conduct was so unforeseeable that no one would think that the wrongdoer would act in such a way. As stated, Soto's conduct was not so unforeseeable here.

¶ 34    Our recent decision in *Fenton v. City of Chicago*, 2013 IL App (1st) 111596, also informs our opinion here today. In *Fenton*, City police responded to a man's complaint of a domestic disturbance involving his girlfriend's son, who was drunk and disruptive. The police initially

-10-

offered to arrest the young man, if the victim and the young man's mother so desired. They demurred and the police escorted the young man to his bed and they left the household. Some time later, the police were again summoned for the same problem. On this occasion, police took the agitator from the home and left him on the sidewalk, near the home, where he was to wait for approximately an hour for a ride, despite the fact that the temperature was zero degrees and that it was the middle of the night. The police left the young man on the sidewalk and they left the area, only to be called again a mere six minutes later, with the victim saying that the agitator was breaking into the home. Before police arrived, the victim was badly beaten and stabbed, which led to his death. Among other arguments, the City argued that the conduct of the agitator returning to the scene was legally unforeseeable or an independent intervening cause. *Id.* ¶ 31. We held to the contrary in *Fenton*, and the City's arguments here are equally unavailing. *Id.* ¶ 39.

¶ 35      The City's causation argument flies in the face of evidence that the City's own permit required it to supply protection for this work site. It also ignores that the City removed much, if not all, of this protection when its crew went to lunch. This sort of conduct goes well beyond supplying a condition that makes injury possible. In truth, it greatly exacerbated the possibility that Martinelli, or Santiago, or some other motorist or pedestrian would be injured or killed because of the confusing situation that this work site presented to motorists traveling in both directions on Milwaukee Avenue. This was not a matter of "if" an accident might occur, but "when" it would occur, the proverbial accident waiting to happen.

¶ 36      Finally, despite the City's urging, there simply is no requirement in the law that the defendant anticipate the specific act or acts of a driver in these circumstances. See, *e.g.*, *Dillon v. U.S. Steel Corp.*, 159 Ill. App. 3d 186 (1987). In the context of this specific occurrence, evidence showed that Soto followed a vehicle around the viaduct pillar and then had a mere 3.5 seconds, in all likelihood, before the accident occurred. *Before* he looked for the pack of cigarettes, he was confronted by unexpected vehicles coming at him and he recognized potential peril. This would necessarily occupy some of this time. With the momentary distraction supplied by the cigarettes falling, he had virtually no time to react to avoid hitting Martinelli. His actions were clearly negligent or careless, but foreseeable. Therefore, the City was not entitled to a judgment *n.o.v.* and the verdict against it is legally supportable *vis-à-vis* proximate causation.

¶ 37                         C. EVIDENTIARY RULINGS

¶ 38      The City also argues that, in the event that its other requests for relief are not granted, it is entitled to a new trial because of adverse evidentiary rulings made by the learned judge below. We review a trial judge's ruling on admissibility of evidence for an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003).

¶ 39      At trial, plaintiffs introduced evidence establishing that, after the accident, the City reestablished the barricades it had previously put in place and that it put the flagmen back in the street in the area of the occurrence. When this issue was first addressed at trial, the City failed to object to any questions that sought to establish that it had control of the area from the viaduct to the specific area where the accident occurred. As a result, this issue is

forfeited. *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 904 (1997). Furthermore, as plaintiffs argue in their brief, the City did not acknowledge that it controlled this entire area and sought, instead, to establish that it only controlled the area where the excavation and accident took place. Accordingly, the evidence offered by plaintiffs would be properly admitted as impeachment on the issue of control. *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 72. Despite statements to the contrary in its briefs before this court, the City very clearly attempted in cross-examination of water department employees, such as Dwyer, Kelly and Stewart, to establish that the City's control was limited. Thus, this evidence was proper under these circumstances and the trial court did not abuse its discretion, especially given the fact that it instructed the jury that this evidence was limited to the issue of control. See *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002).

¶ 40      Next, the City complains that the trial court erred in admitting a postoccurrence photograph that demonstrated the location of the involved vehicles in relation to the location of the viaduct. The City finds prejudice in the fact that certain of the vehicles shown in this photograph were not present at the time of the accident and that other photographs without those vehicles could have been utilized. In response, plaintiffs correctly advise that this specific photograph was used by a previous witness, without objection, to again establish the issue of control. Accordingly, we find no abuse of the trial court's discretion or prejudice here, especially given that the City admits that at least one of its vehicles was at the scene when the collision occurred and since its ram hoe operator was actively working at the site at that time.

¶ 41      Finally, the City claims that the trial judge erroneously allowed evidence of its improper failure to use certain traffic safety devices. In light of our determination that other evidence presented at trial more than adequately supported the jury's finding that the City was negligent, we find no reversible error in this regard. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1076 (2007) (the erroneous admission of evidence does not require reversal where the evidence did not materially affect the outcome of trial or no prejudice resulted).


¶ 42                                        CONCLUSION
¶ 43      Accordingly, we affirm the judgment of the circuit court.


¶ 44      Affirmed.