2025 IL App (4th) 241630

NO. 4-24-1630

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ALEXIS H. EDDINGTON, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| THE CITY OF SPRINGFIELD, | ) | No. 22LA43 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice Knecht concurred in the judgment and
opinion.

**OPINION**

¶ 1      Following a bench trial in this personal injury case, the trial court entered a

judgment in the amount of $186,000 in favor of plaintiff, Alexis H. Eddington, against defendant,

the City of Springfield (hereinafter City or defendant). Defendant appeals, arguing that plaintiff

failed to prove her case under a voluntary undertaking theory and that defendant is immunized

from liability pursuant to section 3-104 of the Local Governmental and Governmental Employees

Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-104 (West 2020)). We reverse the

judgment because defendant is immunized from plaintiff's negligence claim.

¶ 2                    I. BACKGROUND

¶ 3            A. The Facts Surrounding Plaintiff's Injury

¶ 4      The facts relevant to our decision are undisputed. They were elicited at a bench

trial, primarily through the parties' factual stipulations and agreement for the trial court to consider depositions and records.

¶ 5       The evidence showed that the State of Illinois owned and maintained a light pole in Springfield, Illinois, on a stretch of road called J. David Jones Parkway that was maintained by the Illinois Department of Transportation. Sometime before 2:20 a.m. on April 3, 2021, this light pole was somehow knocked over, possibly in connection with a hit-and-run accident. The pole fell from the median onto the roadway, obstructing both southbound lanes of traffic.

¶ 6       At 2:20 a.m., Timothy Tolliver struck this pole with his vehicle. In response to Tolliver's accident, at 2:21 a.m., an employee of the Springfield Police Department notified an operator for City Water, Light & Power (CWLP)—an entity that is also part of the City—of the downed light pole. Although CWLP employed six troubleshooters who customarily responded to calls of downed poles, none of the troubleshooters were working at this early hour. Nevertheless, at 2:27 a.m., a CWLP dispatcher contacted troubleshooter Kirk Jacobs at his home and directed him to go to the scene of the downed pole. Jacobs explained in his deposition that he was experienced in handling situations like these, as he personally responded to calls of downed light poles about once a month. His training included completing a four-year apprenticeship and obtaining a linemen's ticket from the Illinois Department of Labor.

¶ 7       Jacobs left his home, went to CWLP's shop to get a work truck, and then proceeded to the location of the downed pole. Jacobs estimated that it would have taken him at least half an hour to get to CWLP's shop and then another 10 or 15 minutes to get to the downed pole. Meanwhile, Officer Byrne of the Springfield Police Department (the officer's first name does not appear in the record) responded to the scene of Tolliver's accident at some point. The record does not include testimony, a deposition, or an affidavit from Byrne. Accordingly, there is no evidence

as to what, if anything, Byrne did while he was at that scene to protect motorists from the road obstruction. It can be deduced only that sometime before 3:01 a.m., Byrne departed the scene, leaving the obstruction in the roadway unmarked, unguarded, and in the same position it had been before Tolliver's accident.

¶ 8 At 3:01 a.m., Christiana Williams struck the downed pole as she drove southbound on J. David Jones Parkway. Plaintiff, who was a back-seat passenger in Williams's vehicle, tore her anterior cruciate ligament. Jacobs arrived at the scene sometime later. By 3:42 a.m., Jacobs had taped the hot wires on the light pole to render the electricity safe and used his small bucket truck with a boom to tie off the pole, lift it up, and rotate it off the roadway. Jacobs estimated that it took him 15 minutes to complete those tasks after he got set up at the scene. According to Jacobs, unlike the light poles owned by the City that were made of either fiberglass or wood, State-owned light poles had to be moved by truck and could not be picked up by hand.

¶ 9 B. The Parties' Positions

¶ 10 Plaintiff alleged in her amended complaint that defendant, through its agents and employees, "negligently undertook an effort to correct [the] obstruction by leaving it unmarked and unguarded in a place where an oncoming vehicle could strike the same." Specifically, plaintiff alleged that defendant was negligent through its agents and employees, who (1) "[f]ailed to properly respond to an obstruction in the roadway when they were so informed," (2) "[u]ndertook to clear the street where the light pole originally fell following the first accident but negligently failed to complete that undertaking before leaving the scene," (3) "[l]eft the light pole in the street after the first accident without marking the same or placing barricades," (4) "[l]eft the light pole in the street where it was initially found without changing its position," (5) "responded to an accident scene and notified City personnel of the need to clear an obstruction from the roadway

- 3 -

but failed to keep the obstruction marked or guarded before a second motor vehicle accident occurred at the same place," and (6) "[f]ailed to rectify a dangerous condition on a portion of the roadway which it had undertaken to keep safe at a time when the City had knowledge that a dangerous condition existed."

¶ 11    Defendant argued that it owed no duty to plaintiff because it did not own or maintain either the roadway or the light pole at issue and did not voluntarily undertake a duty to protect plaintiff. Defendant also invoked section 3-104 of the Tort Immunity Act, which provides:

> "Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to initially provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." 745 ILCS 10/3-104 (West 2020).

¶ 12                    C. The Trial Court's Judgment

¶ 13    On December 17, 2024, the trial court entered a judgment order awarding plaintiff $186,000. Relevant to the question of whether plaintiff proved her case against defendant under a voluntary undertaking theory, the court found as follows:

> "[R]egardless of the ownership of J. David Jones Parkway, the City of Springfield and the Springfield Police Department, through Officer Byrne, voluntarily undertook action to remove an obvious hazard from the roadway, but negligently performed that undertaking so as to subject the Plaintiff to a foreseeable risk of harm. *** The evidence shows Officer Byrne appeared at the scene, noted the dangerous condition in the highway, recognized the need to remediate that

condition, and took specific action to do so. However, after recognizing the danger and taking action to remediate it, Officer Byrne left the scene without placing barricades, cones, or any other kind of warning device. He made no effort to divert traffic away from the obstruction, which was already proven to be a danger to passing motorists, including properly positioning his marked squad car, with illuminated lights, at a safe distance to mitigate the danger of the road obstruction while waiting for another marked vehicle to guard the scene with lights or markers. Officer Byrne took no corrective measures to divert the traffic flow away from an otherwise unavoidable hazard in any way conceivable. In essence, after he and the Springfield Police Department recognized the pole as a hazard and undertook to remediate it, Officer Byrne left the pole across the southbound lane as it was before the first accident. By doing so, he subjected the Plaintiff in this matter to a foreseeable risk of harm."

The court found that defendant undertook a "duty to make an obvious danger on J. David Jones Parkway less dangerous." Such duty extended to plaintiff, who was foreseeably injured by defendant's performance, even though she did not rely on defendant's undertaking and nobody moved the light pole before the injury occurred.

¶ 14 The trial court also found that section 3-104 of the Tort Immunity Act did not apply. The court deemed the cases cited by defendant to be factually distinguishable "to such a material and substantive degree that this court is unpersuaded that said opinions control the outcome of this litigation." The court reasoned:

"[T]he instant case involved a hazardous obstruction, a street light pole, unnaturally positioned in the dark of night directly across the free flowing lanes of traffic on a

major thoroughfare within defendant's jurisdictional boundaries, and said hazard was proven capable of inflicting serious property and personal injury damage to unaware motorist[s] travelling innocently upon the highways as evidenced by the fact that the reason Defendant was even at the scene responding to the dangerous hazard was because a motorist had already struck the pole dangerously located across multiple lanes of traffic and was requiring assistance as a result of encountering the pole."

The court noted that, unlike the cases cited by defendant, the obstruction here "was not merely an obstacle adjacent to the relevant highway." Rather, according to the court:

"This case involved an obvious dangerous condition where the circumstances demonstrated that an immediate response was required to the transportation crisis occurring on the roadways within the city limits of the Defendant municipality. Defendant was the party summoned to engage in the required intervention to reestablish and maintain the safety of the roadway and the Defendant's direct response to its duty to maintain safe highways is the actionable conduct being reviewed in this analysis."

In the court's view, the cases cited by defendant did "not have this active level of involvement in their respective fact patterns" and did not support a claim of immunity. The court believed that case law left open the possibility that the degree of foreseeability of an injury alone might, in an appropriate case, create liability. The court found that the "obvious" and "undeniable" foreseeability of an injury here itself supported liability. The court also explained that defendant's negligent conduct—leaving motorists such as plaintiff exposed to a known and dangerous traffic obstruction "for a considerable length of time"—was not the type of policymaking decision made

in the course of the operation of government that the legislature intended to come within the scope of section 3-104 of the Tort Immunity Act. The court believed that recognizing defendant's immunity "would create a manifest injustice."

¶ 15    Defendant filed a timely notice of appeal.

¶ 16                                II. ANALYSIS

¶ 17    On appeal, the parties debate two issues: (1) whether plaintiff proved her case under a voluntary undertaking theory and (2) whether section 3-104 of the Tort Immunity Act shields defendant from liability. Although the parties intermingle their analyses of these issues, whether a local governmental entity was negligent is a distinct question from whether a statutory immunity applies. See *Wright-Young v. Chicago State University*, 2019 IL App (1st) 181073, ¶ 62 (although the case did not involve section 3-104, the court recognized that a local governmental entity might have immunity under various sections of the Tort Immunity Act even if it "would otherwise have a duty based on a voluntary undertaking"). For reasons we will explain, even if we assume plaintiff is correct that she proved the elements of a negligence claim against defendant under a voluntary undertaking theory, section 3-104 of the Tort Immunity Act shields defendant from liability.

¶ 18    Whether a provision of the Tort Immunity Act precludes a plaintiff from recovering damages for negligence is a question of law that we review *de novo*. See *Martinelli v. City of Chicago*, 2013 IL App (1st) 113040, ¶ 18 (in an appeal following a trial, the court reviewed *de novo* an argument that section 3-104 of the Tort Immunity Act immunized the defendant from the plaintiff's claim).

¶ 19                        A. The Scope of Immunity Under Section 3-104

¶ 20    Section 3-104 of the Tort Immunity Act immunizes local public entities and their employees "for an injury caused by the failure to initially provide regulatory traffic control devices,

stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." 745 ILCS 10/3-104 (West 2020). Although the language of the statute may seem straightforward, the case law interpreting it demonstrates that the rule proves rather nuanced in its application.

¶ 21       Obviously, the statute is concerned with traffic control and safety, as its plain language identifies a wide variety of methods of controlling traffic and protecting the public. To that end, courts have interpreted the statute to encompass both permanent and temporary methods of controlling traffic and warning motorists of dangerous road conditions. See *West v. Kirkham*, 147 Ill. 2d 1, 6 (1992) (holding that a city was immune from allegations of negligence relating to its failure to provide a left-turn arrow at an intersection); *Jefferson v. City of Chicago*, 269 Ill. App. 3d 672, 677-78 (1995) (holding that a plaintiff's allegations relating to a city's failure to provide a "flagman" at a construction site and failure to place traffic cones in certain locations fell within the scope of section 3-104).

¶ 22       Critically, however, section 3-104 provides immunity only to the extent that a plaintiff's injury is "caused" by a local public entity's or public employee's "initial[ ]" failure to provide traffic control devices or warnings. 745 ILCS 10/3-104 (West 2020). The import of the word "initial" is that if a local public entity never undertook to provide a specific traffic control device or warning, the entity may not be held liable for damages caused by such failure. See *West*, 147 Ill. 2d at 6, 10 (holding that a city was immunized for its alleged negligence in failing to provide a left-turn arrow for southbound traffic at an intersection, even though the city had provided a left-turn arrow for northbound traffic). On the other hand, if a local public entity implements a mechanism of controlling traffic, the entity will not be immunized from liability in

connection with an injury caused by the subsequent negligent maintenance of that improvement. See *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 217-18 (2006) (holding that a county was not immunized where it restriped a road in violation of no-passing-zone regulations that had changed since the county originally striped the road, as an injury caused by the restriping did not implicate the county's initial omissions with respect to providing road markings). Moreover, section 3-104 does not apply where a plaintiff's injury is caused by something other than the initial failure to provide traffic-control measures, such as a local public entity's affirmative negligence in removing existing traffic-protection devices. See *Martinelli*, 2013 IL App (1st) 113040, ¶¶ 18, 21 (explaining that section 3-104 did not provide immunity to the extent that a city caused the plaintiff's injury by (1) removing traffic safety devices in a work zone during a lunch break and (2) blocking a lane of traffic, forcing motorists to drive into a lane used for oncoming traffic).

¶ 23        Applying these general rules can lead to subtle distinctions, even within a single case. For example, in *Jefferson*, the court held that section 3-104 did not immunize a city from a plaintiff's allegations that it negligently placed cones to regulate traffic, even though the statute immunized the city from allegations that it should have placed cones in additional locations or provided a "flagman" to warn motorists. *Jefferson*, 269 Ill. App. 3d at 677-68. In *Corning v. East Oakland Township*, 283 Ill. App. 3d 765, 766 (1996), the Fourth District considered how section 3-104 applied where local public entities installed a stop sign at an intersection but then failed to replace that sign or warn the public of the danger after the sign was removed by "persons unknown." We held that section 3-104 did not shield the defendants from the plaintiff's allegations that she was injured due to the defendants' failure to maintain the stop sign. *Corning*, 283 Ill. App. 3d at 771. However, we held that section 3-104 shielded the defendants from plaintiff's other

allegations that she was injured due to the defendants' failure to warn her of the missing stop sign "by posting barricades or other traffic control devices." *Corning*, 283 Ill. App. 3d at 771.

¶ 24 The final point to make is that section 3-104 is notable for its lack of an exception for willful and wanton conduct. The statute provides absolute immunity when a plaintiff's allegations fall within its scope, even if the defendant had notice of the specific unsafe condition that caused the plaintiff's injury. *West*, 147 Ill. 2d at 6-7. Nor does the statute's application depend on the severity of the danger posed to the public. Thus, for example, failing to warn of a very hazardous object obstructing a roadway is the type of omission that may come within the scope of the statute, even if the defendant had knowledge of the danger. See *Castorena v. Browning-Ferris Industries of Illinois, Inc.*, 237 Ill. App. 3d 702, 702-04 (1992) (*Castorena II*) (holding that a city was immunized from liability for an injury resulting from a vehicle hitting a dumpster in a roadway, even though the city was aware of a prior similar accident); *Castorena v. Browning-Ferris Industries of Illinois, Inc.*, 217 Ill. App. 3d 328, 330-33 (1991) (*Castorena I*) (providing a more complete recitation of facts in this first opinion, which was issued before the supreme court remanded the matter for reconsideration in light of *West*).

¶ 25 As can be seen, to determine whether immunity applies in a given case, it is necessary to consider exactly what the local public entity or public employee did and did not do, along with the plaintiff's specific theory of how the defendant's negligence caused an injury.

¶ 26 B. Plaintiff's Theory of Negligence

¶ 27 Plaintiff relies broadly on a voluntary undertaking theory to support her negligence action against defendant. However, plaintiff's precise theory of what caused her injury is difficult to ascertain. In her amended complaint, plaintiff referenced the conduct of defendant's "agents and employees" without specifying which public employees she was criticizing. Her broad allegations

of negligence—for example, that defendant's agents and employees "[f]ailed to properly respond to an obstruction in the roadway when they were so informed" or "[f]ailed to rectify a dangerous condition"—could encompass any number of specific acts or omissions. Precision matters when it comes to assessing whether a defendant has immunity under section 3-104.

¶ 28 During oral argument, we attempted to pinpoint plaintiff's specific legal theory. At one point, plaintiff's counsel briefly mentioned that part of plaintiff's theory is that defendant's agents did not get someone "out there early enough" to clear the obstruction before plaintiff's accident. A theory that plaintiff's injury was caused by an unreasonable delay in moving the downed pole would *not* implicate section 3-104, as such a theory does not involve the initial failure to provide traffic-control measures. However, plaintiff did not expressly rely on this theory at trial, nor did she mention it in her appellee's brief. Moreover, the evidence does not justify recovery under this theory. Plaintiff did not present evidence that either Jacobs or a different CWLP troubleshooter could have gotten to the scene faster to move the pole.

¶ 29 At another point during oral argument, plaintiff's counsel seemed to acknowledge that plaintiff's allegations of negligence focused primarily on Byrne, the police officer who responded to the scene of Tolliver's accident but then left before plaintiff was injured and Jacobs arrived. Counsel suggested that Byrne could have dragged the pole off the road. Although plaintiff did not articulate this theory at trial or in her appellee's brief, she referenced this theory in her response to defendant's motion for summary judgment before trial. The theory seems to invoke the amended complaint's allegations that defendant's agents and employees were negligent for (1) undertaking to "clear the street" but then failing "to complete that undertaking before leaving the scene" and (2) leaving the pole in the street "without changing its position." If the evidence indeed supported a finding that plaintiff's injury was caused by Byrne unreasonably failing to

remove the obstruction from the roadway himself, that would *not* be the type of omission that implicates section 3-104 of the Tort Immunity Act. However, plaintiff presented no evidence that Byrne or any other police officer who could have been summoned to the scene had the equipment or training necessary to move a downed light pole with exposed hot wires from the roadway. Contrary to what plaintiff's counsel claimed during oral argument, the evidence showed that this was not a pole that could simply be removed from the roadway by hand. The whole point of the police contacting CWLP was because that department employed experienced troubleshooters with specialized equipment who could remediate a road obstruction of this nature. Plaintiff's counsel also proposed during oral argument that Byrne could have used a "chain" to move the light pole himself. Again, there was no evidence that Byrne or any other police officer had access to a chain or that this would have been a viable option for moving this obstruction.

¶ 30        Plaintiff's counsel also mentioned that Byrne could have "lit a flare," kept his car at the scene of Tolliver's accident, called other police officers, or "gotten out with a flashlight." We interpret counsel's remarks as meaning that Byrne caused plaintiff's injury by departing the scene of Tolliver's accident before Jacobs arrived without implementing any traffic-control measures to warn or protect motorists from the obstruction in the roadway. This theory is outlined broadly in the amended complaint, as plaintiff alleged that defendant's agents and employees should have placed barricades, marked the downed light pole, or guarded it. This is also the theory that plaintiff advanced at trial. In its written judgment order, the trial court seemed to rely on this theory in entering judgment in plaintiff's favor, explaining that Byrne departed the scene without placing barricades, cones, or other warning devices. The court also mentioned that Byrne did not divert traffic away from the obstruction by positioning his squad car to illuminate the obstruction while awaiting another "marked vehicle to guard the scene with lights or markers."

¶ 31        We hold that section 3-104 immunizes defendant from liability in connection with plaintiff's theory that Byrne left the scene of Tolliver's accident without implementing traffic-control measures to warn or protect motorists from the obstruction in the roadway. Notably, plaintiff failed to introduce any testimony, deposition, or affidavit from Byrne. The record does not reflect (1) what time Byrne arrived at or departed the scene of Tolliver's accident, (2) where Byrne parked at that location in relation to the downed light pole, (3) whether Byrne ever activated emergency lights at that location, or (4) whether Byrne ever attempted to illuminate the scene of the obstruction or warn motorists in any way. Thus, the record contains no evidence that Byrne affirmatively caused plaintiff's injury by removing a protective mechanism already in place that might have prevented the injury. See *Martinelli*, 2013 IL App (1st) 113040, ¶¶ 18, 21 (explaining that section 3-104 did not provide immunity where the city affirmatively caused the plaintiff's injury by (1) removing traffic protections at a work site during a lunch break and (2) blocking a lane of traffic, forcing motorists to drive into a lane used for oncoming traffic). Plaintiff emphasizes that Byrne did nothing when he could have done something. But by identifying the various things Byrne could have or should have done to control traffic or warn motorists of the road obstruction, plaintiff is complaining of the "failure to initially provide" those measures, which directly implicates the immunity provided by the statute. 745 ILCS 10/3-104 (West 2020).

¶ 32        Specifically, plaintiff's allegation that Byrne should have either placed barricades or marked the downed light pole falls squarely within the scope of section 3-104, which provides immunity for failures to initially provide both "traffic separating or restraining devices or barriers" and "distinctive roadway markings." 745 ILCS 10/3-104 (West 2020). Plaintiff's allegation that Byrne should have guarded the obstruction, though vague, likewise seems to charge defendant with failing to provide a "barrier" of sorts. In addition to the measures plaintiff identified in her

- 13 -

amended complaint, the trial court mentioned in its judgment order that Byrne could have used traffic cones or other warning devices, but those are also measures that fall within the scope of the statute. See 745 ILCS 10/3-104 (West 2020) (including "regulatory traffic control devices"); see also *Jefferson*, 269 Ill. App. 3d at 677-78 (holding that a plaintiff's allegations regarding a city's failure to provide traffic cones in specified locations fell within the scope of section 3-104, even though the city had placed cones elsewhere in the area). The court's other suggestion that Byrne could have diverted traffic by positioning his squad car to illuminate the obstruction while awaiting another marked vehicle essentially meant that Byrne should have used his squad car as either a barrier or a device to warn motorists. But again, the statute provides immunity for the failure to initially provide both "barriers" and "any other traffic regulating or warning sign, device or marking." 745 ILCS 10/3-104 (West 2020). We also see little meaningful difference between the court's proposal and saying that defendant should have provided a "flagman" but failed to do so, which is something courts have said falls within the scope of section 3-104. See *Jefferson*, 269 Ill. App. 3d at 677-78. The same is true with respect to plaintiff's counsel's suggestion during oral argument that Byrne could have warned motorists by using a flare or a flashlight.

¶ 33 Having carefully reviewed the record and considered the various theories plaintiff proposed, we ascertain no legal theory that is both supported by the evidence and falls outside the scope of section 3-104.

¶ 34 C. The Trial Court's Reasoning

¶ 35 The trial court offered three overarching reasons why it determined that section 3-104 does not shield defendant from liability: (1) the cases cited by defendant do not involve active participation by a local public entity to address an emergency road obstruction, (2) defendant's negligence is not the type that the legislature meant to immunize, and (3) the high degree of

foreseeability of an injury here renders the statute inapplicable. None of these reasons withstand scrutiny.

¶ 36        The trial court correctly recognized that defendant cited factually distinguishable cases. However, as noted above, our research uncovered *Castorena I* and *Castorena II*, in which the appellate court ultimately held that section 3-104 immunized a city for failing to warn of the presence of a dumpster in the roadway, even though the city's police responded to a similar accident a month earlier and did nothing more than prepare a police report. *Castorena II*, 237 Ill. App. 3d at 703-04; *Castorena I*, 217 Ill. App. 3d at 330, 332-33. Thus, precedent shows that section 3-104 applies even where a defendant has knowledge that an extremely hazardous and unnatural object is obstructing the roadway and already caused an accident.

¶ 37        The trial court was justifiably concerned about and alarmed by Byrne's failure to take any measures to protect motorists from a downed light pole obstructing both lanes of southbound traffic in the middle of the night. The court was also correct that this constituted an emergency, or "transportation crisis" as the court called it. Nevertheless, the plain language of section 3-104 makes no distinction regarding the severity of the danger posed. Nor does the statute specify an exception to its broad grant of immunity for situations where police officers respond to an emergency and summon help but fail to implement traffic-control measures to warn or protect the public. Rather, the statute says that where an injury is caused by the failure to "initially" provide certain traffic-control measures, the local public entity cannot be held liable. Although the court expressed that it would be a "manifest injustice" to recognize defendant's immunity here, we must apply the statute as written, without reading into it exceptions that are not in the plain language. See *West*, 147 Ill. 2d at 6 (refusing to "find a substantial limitation on the immunity of section 3-104 where none exists").

¶ 38    The trial court also reasoned that the statutory intent underlying section 3-104 does not apply to the circumstances. Our supreme court has explained that section 3-104 protects policy decisions made in the course of the operation of government that require "balanc[ing] competing interests" and "mak[ing] a judgment call as to what solution will best serve each of those interests." *West*, 147 Ill. 2d at 11. As mentioned, the record does not contain testimony from Byrne, so there is no indication why he departed the scene of Tolliver's accident and left the obstruction unmarked and unguarded. Regardless of the reasons that Byrne chose not to warn motorists of the downed light pole or divert traffic, those were judgment calls about traffic management and cannot form the basis for liability. See *Culver v. Velcor*, 247 Ill. App. 3d 589, 595-96 (1993) ("The 'operation of government' includes the public entity's decision-making power to provide traffic control devices on property it maintains or to provide signs to warn of downed traffic control devices on property maintained by another entity."). The statute does not say that decisions must be wise or socially desirable to fall within the scope of the statute, nor is there an exception for willful and wanton conduct. The statute also does not say that a policy decision is immunized only when it is made by a governing board or traffic planner, rather than a police officer.

¶ 39    The trial court's final reason for declining to apply section 3-104 was that the court interpreted *Newsome v. Thompson*, 202 Ill. App. 3d 1074, 1080 (1990), as supporting the proposition that "in some circumstances, the degree of foreseeability of injury alone could create liability." The court read *Newsome* too broadly. *Newsome* expressly states, "Given our conclusion that the City is immune from liability for any dangerous condition of the reconstruction work ***, the fact that the injury to plaintiff might have been foreseeable to it is of no consequence." *Newsome*, 202 Ill. App. 3d at 1080. We are aware of no authority indicating that a highly foreseeable risk of injury eradicates the immunity afforded by section 3-104. The plain language

- 16 -

of the statute certainly does not say that. Moreover, in *West*, which was decided after *Newsome*, our supreme court recognized that section 3-104 applies even where a local public entity has notice of a dangerous condition. *West*, 147 Ill. 2d at 7.

¶ 40                                         D. Summary

¶ 41        Whenever a statute offers absolute immunity, there will inevitably be cases where applying it to bar recovery seems harsh or unfair. After carefully scrutinizing the record and case law, we hold that section 3-104 of the Tort Immunity Act applies and immunizes defendant from plaintiff's allegations of negligence. We are compelled to reverse the trial court's judgment in plaintiff's favor.

¶ 42                                    III. CONCLUSION

¶ 43        For the reasons stated, we reverse the trial court's judgment.

¶ 44        Reversed.

*Eddington v. City of Springfield*, 2025 IL App (4th) 241630

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 22-LA-43; the Hon. John M. Madonia, Judge, presiding. |
| **Attorneys for Appellant:** | Steven C. Rahn and Michael Hampleman, Senior Assistant Corporation Counsel, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Francis J. Lynch and Suzanne L. Dennis, of Wolter, Beeman, Lynch & Dennis, LLP, of Springfield, for appellee. |